**UNITED STATES of America, Appellee,**

v.

**Anthony Damian AZURE, Appellant.**

No. 85–5407.

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1986.
Decided Sept. 17, 1986.

Cameron Hayden, Grand Forks, N.D., for appellant.

Norman G. Anderson, Fargo, N.D., for appellee.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and LARSON, Senior District Judge.*

HENLEY, Senior Circuit Judge.

Anthony Damian Azure appeals his conviction by a jury in the United States District Court for the District of North Dakota for carnal knowledge of a female under the age of sixteen, in violation of 18 U.S.C. §§ 1153 and 2032. For reversal Azure argues that no federal jurisdiction existed over this offense and that the trial court erred in admitting expert opinion testimony

---

* The Honorable Earl R. Larson, United States Senior District Judge, District of Minnesota, sitting by designation.

regarding the credibility of the victim, in admitting testimony by a social worker that the victim understood the difference between the truth and a lie, in admitting evidence of alleged past physical abuse of the victim, in admitting evidence of alleged past sexual abuse of other children in the household, and in admitting the out-of-court statement of the victim made to a social worker. Because we find that the trial court erred in allowing expert opinion evidence regarding the victim's credibility, we reverse Azure's conviction.

Azure and his common law wife Patricia Lozensky live together in a house near St. John, North Dakota. Living with them at the time of the alleged incident were Michelle Faine, age thirteen at the time of the trial on September 17 and 18, 1985, Wendy Lozensky, age eleven at the time of the trial, Melissa Lozensky, age ten at the time of the trial, Melony Azure, age five at the time of the trial, and Damian Azure, Jr., age three or four at the time of the trial. Melony and Damian, Jr. are the children of Damian Azure and Patricia. Michelle, Wendy and Melissa were born to Patricia prior to her present relationship with Azure. Appellant was charged with having had sexual intercourse with Wendy in his house on or about December 8, 1984,[1] and Patricia Lozensky was charged with misprison of a felony in violation of 18 U.S.C. § 4. Following trial by jury, both were found guilty. Azure was sentenced to a prison term of twelve years. This appeal followed.

### I.

We address first the jurisdictional issue. Section 1153 gives the federal courts exclusive jurisdiction over certain crimes committed by an Indian within Indian country. Unlawful carnal knowledge of a female under the age of sixteen, a violation of § 2032, is one of the crimes included in § 1153. Indian country is described in 18 U.S.C. § 1151 as:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

The alleged incident of sexual abuse took place in Azure's residence, which is located about two miles from the boundary of the Turtle Mountain Indian Reservation. The house is located on land that is held in trust by the United States for the Reservation, and the tribe leases this trust land only to Indians. Azure is fifty percent Chippewa Indian.

In addressing the question of whether the alleged crime occurred in Indian country, Azure and the government focus on the location of Azure's house as being within or outside a dependent Indian community. We feel, however, that it is necessary to focus first on the question whether for purposes of criminal jurisdiction this Indian trust land should be considered a reservation. It is well established that the actions of the federal government in its treatment of Indian land can create a *de facto* reservation, even though the reservation was not created by a specific treaty, statute or executive order. *See Mattz v. Arnett,* 412 U.S. 481, 490, 93 S.Ct. 2245, 2250, 37 L.Ed.2d 92 (1973); *Sac & Fox Tribe v. Licklider,* 576 F.2d 145, 149–50 (8th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *United States v. White,* 508 F.2d 453, 456–57 (8th Cir.1974). Among the key factors in the finding of a *de facto* reservation in *Sac & Fox Tribe* were the actions of the BIA in expending

---

**1.** As would be expected, the factual details regarding the December 8 incident are very unsettling. Since they are not necessary to our decision in this case, no purpose would be served by repeating them here.

funds and providing social services for the area. 576 F.2d at 149.

■ In *United States v. John*, 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978), the Supreme Court, in discussing land held in trust by the United States for the Mississippi Choctaw Indians, noted that "[t]here is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction at that particular time." (Citation omitted.) *See also Langley v. Ryder*, 602 F.Supp. 335, 340–41 (W.D.La.), *aff'd*, 778 F.2d 1092 (5th Cir.1985). Similarly, it would appear here that the Indian trust land, although not within the boundaries of the Turtle Mountain Reservation, can be classified as a *de facto* reservation, at least for purposes of federal criminal jurisdiction.

■ Moreover, the township in which Azure lives can be considered a dependent Indian community. The four factors which enter into the consideration of whether a particular area is a dependent Indian community are:

> (1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting this territory," (2) "the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area," (3) "whether there is an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality," and (4) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples[.]"

*United States v. South Dakota*, 665 F.2d 837, 839 (8th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982) (citations omitted).

The township in which Azure's house is located is a rural area which is very sparsely populated. The government has retained title to the land for the benefit of the Turtle Mountain Indians, and through the Bureau of Indian Affairs it exercises certain criminal jurisdiction over the Indians in the area. The land in the area is leased by the tribe only to Indians, and the BIA services the roads in the area. While the sparse population of the area makes cohesiveness in the township somewhat difficult, the other factors are more than satisfied in this case.

It seems clear that the government recognizes the trust land surrounding Azure's house as being part of either a *de facto* reservation or a dependent Indian community. We therefore conclude that Azure's house is located in Indian country and that criminal jurisdiction in this case is soundly based on § 1153.

### II.

■ Although several issues are raised on this appeal, we are primarily concerned with the question whether a pediatrician may give his opinion as to the truth of the story of a victim of child sexual abuse, an issue of first impression in this circuit. At trial, Dr. Robert ten Bensel was called to testify on behalf of the government. Dr. ten Bensel is a pediatrician and an expert on child abuse. Over pretrial objections by Azure, Dr. ten Bensel was allowed to testify that Wendy was believable and that he could "see no reason why she would not be telling the truth in this matter...." The trial court ruled that Dr. ten Bensel's opinion of the believability of Wendy's story was admissible under Fed.R.Evid. 702 as an expert opinion.

Azure argues that Dr. ten Bensel was not qualified to give an opinion on the credibility of Wendy and that the challenged testimony invaded the exclusive province of the jury to determine the credibility of witnesses. We must agree. Rule 702 allows an expert to give an opinion when his specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue...." The

decision whether to permit expert testimony ordinarily lies within the discretion of the trial court and will not be reversed absent an abuse of discretion. *United States v. Rose*, 731 F.2d 1337, 1345 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984).

Research has not revealed any federal cases addressing this particular issue, but some circuits have addressed the question of the admissibility of expert opinion testimony on credibility in general. In *United States v. Barnard*, 490 F.2d 907 (9th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), the defendants offered expert psychiatric testimony that a government witness was a sociopath who would lie in testifying. In upholding the trial court's rejection of this testimony, the court stated:

> [C]ompetency is for the judge, not the jury. Credibility, however, is for the jury—the jury is the lie detector in the courtroom ... It is now suggested that psychiatrists and psychologists have more [expertise in weighing the veracity of a witness] than either judges or juries, and that their opinions can be of value to both judges and juries in determining [credibility]. Perhaps. The effect of receiving such testimony, however, may be two-fold: first, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is a collateral but still an important matter.

*Id.* at 912. *See also United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.), *cert. denied*, 444 U.S. 885 and 969, 100 S.Ct. 179 and 460, 62 L.Ed.2d 116 and 383 (1979). The Ninth Circuit has further held that "[u]nder the Federal Rules, opinion testimony on credibility is limited to character; all other opinions on credibility are for the jurors themselves to form." *Awkard*, 597 F.2d at 671. *See also United States v. Rosenberg*, 108 F.Supp. 798, 806 (S.D.N.Y. 1952) ("[I]t is hornbook law that the credibility of a witness and the weight to be given his testimony rests exclusively with the jury."), *aff'd*, 200 F.2d 666 (2d Cir. 1952).

The Tenth Circuit addressed this question in *United States v. Samara*, 643 F.2d 701 (10th Cir.), *cert. denied*, 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981). In a tax evasion case, the court upheld the trial court's rejection of an offered summary of the evidence by a defense expert, stating that "[a]n expert 'may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.'" *Id.* at 705 (quoting *United States v. Ward*, 169 F.2d 460, 462 (3d Cir.1948)).

The government does not disagree with these statements of the law, but it contends that child sexual abuse cases present special circumstances where ordinary jurors need help in assessing the credibility of a child witness. *See State v. Saldana*, 324 N.W.2d 227, 231 (Minn.1982). The government argues that an expert with knowledge of how children, and in particular sexually abused children, think and act can aid jurors in a matter which is beyond their common knowledge and ordinary experience. Since Dr. ten Bensel has handled around one thousand child abuse cases and two hundred child sexual abuse cases, the government argues that he was qualified to give an opinion on the believability of Wendy and thereby aid the jurors in assessing her credibility.

We agree that in these types of special circumstances some expert testimony may be helpful, but putting an impressively qualified expert's stamp of truthfulness on a witness' story goes too far in present circumstances. Dr. ten Bensel might have aided the jurors without usurping their exclusive function by generally testifying about a child's ability to separate truth from fantasy, by summarizing the medical evidence and expressing his opinion as to whether it was consistent with Wendy's story that she was sexually abused, or perhaps by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns with patterns in Wendy's story. However, by going further and putting his stamp of believability on Wendy's entire story, Dr.

ten Bensel essentially told the jury that Wendy was truthful in saying that Azure was the person who sexually abused her. No reliable test for truthfulness exists and Dr. ten Bensel was not qualified to judge the truthfulness of that part of Wendy's story. The jury may well have relied on his opinion and "surrender[ed] their own common sense in weighing testimony...." *Barnard*, 490 F.2d at 912.

■ Nor was Dr. ten Bensel's believability opinion admissible under Fed.R.Evid. 608(a), which states:

The credibility of a witness may be ... supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Dr. ten Bensel's opinion evidence went beyond the limitation in Rule 608(a)(1) of only addressing character for truthfulness and addressed the specific believability and truthfulness of Wendy's story. "[S]uch testimony is capable at times of so bolstering a witness' testimony as artificially to increase its probative strength with the jury, and ... its admission therefore may in some situations on this basis constitute reversible error." *Homan v. United States*, 279 F.2d 767, 772 (8th Cir.), *cert. denied*, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960). *See also United States v. Price*, 722 F.2d 88, 90 (5th Cir.1983) (admission of Revenue Agent's testimony that he relied on statements of two people in his investigation because he "believed them" constituted reversible error), *cert. denied*, —— U.S. ——, 105 S.Ct. 3526, 87 L.Ed.2d 651 (1985). We conclude that the trial court abused its discretion in allowing Dr. ten Bensel to give his opinion as to the believability of Wendy's story.

■ Reversal, however, is not required if we are able to find that the trial court's error was harmless. The government's case against Azure was very strong, but, as we have held, sufficiency of the evidence alone is not enough to support a finding of harmless error. *See United States v. Slader*, 791 F.2d 655, 657 n. 2 (8th Cir.1986).

"The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

*Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). Wendy was a key government witness in this case, and her credibility was a very important issue. Since her testimony was very likely bolstered by Dr. ten Bensel's erroneously admitted believability opinion, we cannot say that the error was harmless. *See United States v. Weir*, 575 F.2d 668, 671–72 (8th Cir.1978).

### III.

While it may be unnecessary for us to address the merits of the other alleged errors claimed by Azure, due to the likelihood of their reoccurrence on retrial, we will make some brief comments.

■ Evidence of Azure's prior sexual acts with Melissa appears to be admissible under Fed.R.Evid. 404(b) if it is clear and convincing, if it is relevant to some legitimate issue other than that of Azure's character, and if the potential for unfair prejudice does not substantially outweigh the probative value of the evidence. *See United States v. Wagoner*, 713 F.2d 1371, 1374–75 (8th Cir.1983). "Whether an issue has been raised for purposes of receiving evidence of other wrongful conduct depends on the elements of the offense and the nature of the defense." *Id.* at 1375. Since the incident involving Melissa is very closely connected with the incident that is the subject of the charge in this case, the probative value of the evidence is increased. *See United States v. Gano*, 560 F.2d 990, 992–93 n. 1 (10th Cir.1977). However, sub-

stantial potential for prejudice exists in admitting this evidence and the trial court may wish to minimize or eliminate prejudice through the use of a limiting or cautionary instruction to the jury.

■ The medical report of Dr. Keene from his examination of Wendy was admissible under Fed.R.Evid. 803(6). Rule 803(6) calls for a proper foundation to be made through the "testimony of the custodian or other qualified witness." A proper foundation consists of testimony "that a document has been prepared and kept in the course of a regularly-conducted business activity." *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 626 (8th Cir.1983). Although Dr. Keene was not the records custodian in his office, he clearly knew the procedure used to transcribe his examination notes into reports. He was a qualified witness and made a proper foundation for the admission of the report.

■ Azure complains that portions of the report and Dr. Keene's testimony referred to numerous old scars and a chipped tooth on Wendy. He claims that these references were prejudicial because of their implications of prior physical abuse. Scars and a chipped tooth are likely to be found on most any child, whether physically abused or not. Although evidence of physical abuse possibly could have been misused in this case, we do not feel that mere reference to the scars and chipped tooth were prejudicial. On retrial, however, the government may choose to be more careful throughout the trial in avoiding irrelevant evidence of prior physical abuse of Wendy.

The social worker's testimony that she was satisfied that Wendy knew the difference between truth and lies in context was probably admissible. Social workers are capable, by asking a series of simple questions, of determining whether a child understands the difference between truth and lies. The social worker here testified in detail about the questions that she asked Wendy in that regard. The social worker was most likely qualified as an expert under Rule 702, and she established a sufficient basis for her opinion. As we noted earlier, special circumstances are created by child witnesses. The social worker's opinion did not reach the ultimate question whether Wendy was telling the truth, and her limited opinion may have been very helpful to the jury in evaluating Wendy's story and testimony. Here again, however, on retrial the government may see fit to further limit the examination.

Finally, there is little doubt that Wendy's prior out-of-court statement to the social worker was admissible as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B), but it was only admissible as such after Wendy had been impeached on cross-examination. *See United States v. Dennis*, 625 F.2d 782, 797–98 (8th Cir.1980). In this case, however, Wendy's statement was admitted through the testimony of the social worker prior to Wendy's testimony at trial. The trial court ruled pretrial that her statement was admissible under the catchall hearsay exceptions found in Fed.R.Evid. 803(24) and 804(b)(5). The court's Memorandum and Order of September 11, 1985, allowing Wendy's statement to be introduced into evidence, contains a discussion of the requirements of Rules 803(24) and 804(b)(5).

One of the requirements of both rules is that "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts...." Under Rule 804(b)(5), if Wendy for some reason becomes unable to testify and is unavailable as a witness, it is likely that the most probative evidence of the details of the sexual assault would be her in-court testimony at the previous trial. This testimony is admissible under Fed.R.Evid. 804(b)(1) because it was given under oath and Wendy was subject to cross-examination by Azure. Thus, on retrial the admissibility of Wendy's out-of-court statement under Rule 804(b)(5) may be questionable.

Similarly, if Wendy is available to testify, admissibility of her statement under Rule 803(24) is questionable. The trial court cited *United States v. Iaconetti*, 406 F.Supp. 554, 559 (E.D.N.Y.), *aff'd*, 540 F.2d 574 (2d

Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 738, 50 L.Ed.2d 752 (1977), in noting that the statement will be probative in helping the jury evaluate Wendy's in-court testimony. We feel that if Wendy testifies, the most probative evidence will be her in-court testimony. The out-of-court statement would only serve to corroborate her testimony, and this is not allowed under Rule 801(d)(1)(B) until her testimony has been challenged. *Dennis,* 625 F.2d at 797–98. We suggest, therefore, that the admissibility of Wendy's out-of-court statement be carefully reconsidered by the court.

### IV.

The conviction of Anthony Damian Azure is reversed and the cause is remanded.