## In re Noel M.*
## (6451)

Dupont, C. J., Daly and Norcott, Js.

Argued April 3—decision released October 2, 1990

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Prescott W. May,* with whom, on the brief, was *Scott A. Barton,* for the appellant (respondent mother).

*Patricia Lilly Harleston,* assistant attorney general, with whom, on the brief, were *Clarine Nardi Riddle,* attorney general, and *Susan Pearlman,* assistant attorney general, for the appellee (petitioner).

*Melissa A. Buckley,* for the minor child.

NORCOTT, J. The respondent appeals from the trial court's judgment adjudicating the respondent's minor child, Noel M., to be neglected and committing her to the temporary custody of the department of children and youth services (DCYS). On appeal, the respondent claims (1) that the evidence was insufficient to support a finding of neglect, (2) that the trial court violated her constitutional rights to confrontation and to cross-examination by not allowing her counsel to question the child directly, (3) that the trial court improperly allowed certain witnesses to testify to the ultimate issue of whether the child was being truthful in describing alleged sexual abuse, and (4) that the trial court ignored the Connecticut public policy to promote family integrity.

The following facts are not in dispute. On August 9, 1986, Noel, then eight years old, told her maternal grandmother that she had been sexually molested by her stepfather. The next day, in the presence of her

grandmother, she repeated this accusation to the respondent, who contacted DCYS and the Milford police department. The stepfather was subsequently arrested and charged with risk of injury to a child and sexual assault in the fourth degree.

On August 11, at the suggestion of a DCYS intake worker, the respondent and her child left the marital residence and moved in with the maternal grandmother. After hearing inconsistent statements from the child, and after the stepfather vehemently denied the accusations, the respondent was convinced that her child was incorrect, and, on September 7, she and Noel moved back in with the stepfather.[1]

On September 10, DCYS filed a petition for temporary custody and a finding of neglect, claiming that the child was sexually abused and was being permitted to live under conditions injurious to her well-being.

The trial court held a full hearing on the petition of DCYS. After the hearing, the trial court determined that the child was neglected and committed her to the temporary custody of DCYS for the maximum period of eighteen months with continued residency in the maternal grandparents' home. From that judgment, the respondent appeals.

## I

Before addressing the respondent's claims, we must address the petitioner's argument that this appeal is moot. The petitioner relied upon the fact that the period of temporary custody had expired and the parties agreed to extend the commitment for up to eighteen months more. The petitioner contends that since Noel continued in the custody of DCYS under an extension

---

[1] The stepfather was ultimately acquitted, after a jury trial, on both counts.

of commitment, no practical relief can be afforded to the respondent on appeal from the first commitment. We do not agree.

" 'It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow.' " *Hartford Principals' and Supervisors' Assn.* v. *Shedd,* 202 Conn. 492, 496–97, 522 A.2d 264 (1987); *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* 177 Conn. 17, 19, 411 A.2d 1 (1979). The mere fact, however, that the term of the court's order has expired is not enough to establish that an appeal from that order is moot.

While it is true that the original order of the court committing the child to the temporary custody of DCYS had expired, there still exists an actual controversy over whether Noel is a neglected child. Furthermore, it was only because of this commitment that DCYS was able to seek and obtain an extension under General Statutes § 46b-129 (e).

" '[I]n the absence of a class action, the "capable of repetition, yet evading review" doctrine is limited to the situation where two elements combined: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] reasonable expectation that the same complaining party would be subjected to the same action again.' " *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* supra, 20–21. Under § 46b-129 (e), "[n]inety days before the expiration of *each eighteen-month commitment* made . . . *and each extension* . . . the commissioner of children and youth services shall petition the court to . . . extend the

commitment . . . ." (Emphasis added.) Hence, the respondent could expect to be subjected again to this same action. We conclude, therefore, that this case presents a situation that is capable of repetition yet evading review.

The appellate process in this case has, thus far, consumed over three years and it is possible that the second eighteen month extension period might lapse before any appellate review can be achieved. Accordingly, we will not dismiss the present appeal because of mootness and, instead, turn to the merits of the appeal.

## II

The respondent first claims that there was insufficient evidence to support an adjudication of neglect. We do not agree.

After a full hearing on the petition for adjudication of neglect, the trial court found the following relevant facts. On August 11, 1986, as a result of the respondent's report of the child's allegation of sexual abuse, a DCYS intake worker met with the respondent and her child. The child told the DCYS worker, in a separate interview, that her stepfather had escorted her into the bedroom where he touched her breasts and genital area. The respondent said that the child had said the same thing to her and, at that point, stated that the child was not a liar.

The DCYS worker advised the respondent to move out of the house and to keep the child away from the stepfather or she might risk losing custody of the child. The respondent then took the child and moved into the maternal grandparents' home.

That same day, the respondent took the child to be examined by the child's pediatrician. The pediatrician listened to the child's story and examined her, both in

the presence of the respondent. The child described to the doctor the manner in which her stepfather had, on several occasions, sexually abused her. In his examination the doctor found no evidence of trauma to or penetration of either the vagina or the anus, and he informed the respondent of this in the child's presence. The doctor noted that the child verbalized well and seemed relieved when talking about her complaints. Although he found no objective evidence of abuse, it was his opinion that the child was telling the truth, and he referred her to a licensed clinical psychologist.

During a preliminary meeting with the psychologist, the respondent recounted the child's allegations made to her grandmother. The respondent described Noel as a happy, well adjusted child who would tell the truth and said that the accusation against the stepfather was at variance with the child's history, and the respondent had difficulty believing it.

The respondent became increasingly dissatisfied living at the grandparents' home and feared that the grandmother was seeking to gain custody of the child. Relying on the pediatrician's physical findings, on inconsistencies in the child's stories and what she deemed to be appropriate behavior between the stepfather and child at a group picnic, she decided to return with her child to the stepfather. On September 7, 1986, the respondent told the child that they were going to the apartment to get some clothing and that the stepfather would not be there. When they arrived, the stepfather and his two sons were in the apartment. Although the child protested, the respondent insisted that they spend the night.

Richard M., the child's maternal uncle, visited the apartment that night. At his suggestion, the respondent informed the maternal grandparents that she and the child had returned to the home of the stepfather.

On September 8, 1986, another DCYS intake worker spoke with Noel for about 45 minutes at her school. The child told this worker that the stepfather had touched her private parts and pointed to her breasts and vaginal area. The child also described an incident of sexual abuse by the stepbrother. The child then asked if her stepfather would go to jail. Following the report of this interview, DCYS decided to place a ninety-six hour hold over the child. It served papers on the respondent, picked up the child from school, and brought her to her grandparents' house.

DCYS arranged for the grandmother to bring the child to the sexual abuse clinic at Yale-New Haven Hospital to be examined by a child sexual abuse expert. During the examination, the child described to that physician instances in which her stepfather had sexually abused her, saying that the last date was August 9, 1986, the day she told her grandmother about it. She also said she resisted his attempt to put his penis into her mouth, and she described an incident of attempted sexual abuse by one of her stepbrothers. The child was embarrassed and emotional during this discussion. She was clear, however, in distinguishing the acts performed by her stepfather from those performed by her stepbrother.

The physician's physical findings revealed hymenal tears to the vagina consistent with forced insertions, and she was of the opinion, based upon the manner in which the child told her story and upon the physical evidence, that the child was being truthful. She recommended that the child be placed somewhere where neither her stepfather nor stepbrother would have access to her.

When the clinical psychologist met with the child, she told him that on weekends, the stepfather touched her private parts and that she was scared. She expressed

fear of her stepfather, claiming he had hit her, and anger at her mother for disbelieving her and forcing her to return to the stepfather. The child explained that she did not tell the respondent about the episodes of abuse when they occurred because the respondent had not believed her when she complained of being hit. The child expressed a desire not to see her stepfather again and a preference to stay with her grandparents until her "mother realizes what he did to [her]." Throughout the interviews, the psychologist became convinced that the child was not repeating things that adults had told her to say, but rather that she was recounting events as they had occurred. This belief was based upon the constancy of the story and the manner in which the child expressed it.[2]

The psychologist referred Noel to his associate for psychological testing and an independent evaluation. The associate concluded, based upon the results of tests administered to the child and interviews with her, that she had been truthful in recounting the episodes of abuse.

When the referring psychologist related his discussions with the child to the respondent, she reacted with disbelief as though she felt the incidents could not have taken place. The psychologist characterized her strong expressions of disbelief as denial.

The child testified at the neglect hearing, recounting in detail the specifics of these alleged incidents of abuse. The trial court found the child to be a most credible witness.

On the basis of these findings, the trial court found that the child was sexually abused and that, in return-

---

[2] The psychologist noted that, at first, the child's statements were mechanical as if she had told them to adults on several occasions. Later, however, she became more upset, crying and expressing genuine emotion. At times, she requested that the discussion stop.

ing the child to the stepfather's control, the respondent had acted with full knowledge of the child's claims and consciously chose to disbelieve them. The trial court, therefore, adjudicated Noel to be neglected under General Statutes § 46b-120, which provides that a child may be found "neglected" if that child has been "permitted to live under conditions, circumstances or associations injurious to his [or her] well-being."

In reviewing a claim of insufficiency of evidence, "we review the factual findings below to ensure that they could have been legally, logically and reasonably found, thereby establishing that the trial court could reasonably conclude as it did." *Ernst Steel Corporation* v. *Reliance Ins. Co.*, 13 Conn. App. 253, 258, 536 A.2d 969 (1988). Our function is to review the trial court record. " 'It is not our function to retry the case or to pass on the credibility of witnesses . . . and we will not.' " (Citation omitted.) *In re Christine F.*, 6 Conn. App. 360, 366, 505 A.2d 734, cert. denied, 199 Conn. 808, 508 A.2d 769 (1986); *In re Jason S.*, 9 Conn. App. 98, 109, 516 A.2d 1352 (1986).

From our review of the record, we conclude that the trial court's findings were amply supported by the evidence. The testimony of all the witnesses supported the child's allegations of sexual abuse. The child gave them all generally consistent versions of what had happened to her, and the physical findings showed evidence of sexual abuse. Further, the child testified to the details of the alleged abuse, and the trial court found her to be credible.

The respondent claims that the various versions of sexual abuse recounted by the child were inconsistent, and, therefore, her testimony should be disbelieved. She also claims that the child's credibility was sufficiently attacked when a cousin, whom the child claims to have

told about the sexual abuse and who herself had been sexually abused by the stepbrother, testified that she had no such knowledge.

The trial court found that the various versions of the child's accusations were generally consistent, and the fact that she may have described only one incident to a particular witness and more to another does not mean the additional incidents did not occur. Further, the court found that even if it were to decide against the child as to the inconsistency between the testimony of the child and her cousin, the rest of her testimony was consistent and credible.

"[I]t is the province of the trier of fact to weigh the evidence presented and to determine its credibility." *In re Jason S.,* supra. We will not " ' "second-guess . . . the observations and conclusions of the Superior Court for Juvenile Matters when they are based on reliable evidence." ' " *In re Theresa S.,* 196 Conn. 18, 27, 491 A.2d 355 (1985).

In her final attempt to attack the sufficiency of the evidence on the finding of neglect, the respondent claims that she had no knowledge of the sexual abuse of the child, and, therefore, she could not be found to have neglected her child. It is undisputed that before August 9, 1986, the respondent had no knowledge of the sexual abuse of Noel by her stepfather. What is in issue in this case is the respondent's action of returning home with the child after she had been made aware of the abuse.

The trial court found that the respondent acted with full knowledge of the child's claims and consciously chose to disbelieve them. That ruling is supported by a fair preponderance of the evidence. We conclude that the trial court reasonably adjudicated the child to be neglected. We will not, therefore, disturb that ruling.

## III

The respondent next claims that her constitutional rights to confrontation and to cross-examination and her statutory right to cross-examination provided by General Statutes § 46b-135 (b)[3] were violated by the procedure employed by the court in questioning the child.[4]

The trial court questioned the child in chambers with all counsel, the court monitor and a DCYS social worker present. All questioning was done by the court, but counsel was provided with the opportunity to submit questions in advance. Much of the questioning was based on the questions submitted by counsel. Pursuant to Practice Book § 1042 (7),[5] the respondent was not present.

The respondent does not dispute the validity of her exclusion from the in chambers examination of the child.. She argues, rather, that her rights to confrontation and cross-examination were violated when her attorney was not allowed to cross-examine the child directly.

The respondent's constitutional claim is grounded in the sixth amendment to the United States constitution,

---

[3] General Statutes § 46b-135 (b) provides in pertinent part: "At the commencement of any proceeding on behalf of a neglected . . . child or youth, the parent . . . of the child or youth shall have the right to counsel, and . . . such counsel and such parent . . . shall have the rights to confrontation and cross-examination."

[4] The respondent, in her statement of issues, alleges a due process violation also. This claim is not pursued, however, in the body of the respondent's brief. Therefore, we deem it abandoned and do not address it here. *Adams* v. *Rubinow*, 157 Conn. 150, 168, 251 A.2d 49 (1968).

[5] Practice Book § 1042 (7) provides: "The respondent parties may be physically present in the hearing room while testimony is elicited on behalf of the petitioner, *except where the witness is a child of the respondent.* In such an instance, if the respondent is without counsel, the court shall summarize for him the nature of the child's testimony." (Emphasis added.)

"which is expressly limited to a defendant in a criminal action"; *State* v. *Anonymous,* 179 Conn. 155, 159, 425 A.2d 939 (1979); and in article first, § 8, of the Connecticut constitution, which is similarly limited to criminal defendants. Id. "Neither the sixth amendment to the United States constitution nor article first, § 8, of the Connecticut constitution can be extended to a parent in a termination of parental rights hearing . . . ." Id. It, therefore, cannot logically be extended to a neglect hearing. The respondent's rights to confrontation and cross-examination here are not constitutional rights, but rather statutory ones.

General Statutes § 46b-135 (b) provides: "At the commencement of any proceeding on behalf of a neglected, uncared-for, or dependent child or youth, the parent or parents or guardian of the child or youth shall have the right to counsel, and shall be so informed by the judge, and that if they are unable to afford counsel, counsel will be provided for them, and such counsel and such parent or guardian of the child or youth shall have the rights of confrontation and cross-examination." We have recognized that cases involving the testimony of abused children require special consideration. See e.g., id.; Practice Book § 1042 (7). "The United States Supreme Court has recognized that competing interests 'may warrant dispensing with confrontation at trial.' " *State* v. *Jarzbek,* 204 Conn. 683, 693, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988).

The respondent does not claim the court improperly excluded questions, failed to address a requested area of inquiry, or conducted the examination improperly or in such a way as to cause her prejudice. Cf. id., 696. She challenges only the procedure for the questioning.

In this case, the court allowed all parties to submit questions and areas of concern for examination. The

respondent's counsel was present, and the court allowed the parties to submit additional questions during the examination. The questioning was, in essence, "the functional equivalent of testimony in court." Id., 697. We conclude, that the procedure employed did not deprive the respondent of her rights to confrontation and cross-examination.

## IV

The respondent also claims that the trial court improperly permitted the medical experts to express their opinions as to the ultimate issue of fact in the case, that is, the child's truthfulness. She argues that the truthfulness of the child was the ultimate issue in this case because it was the respondent's disbelief in the child's allegations that prompted her to return home, and it was because she returned home with the child that the trial court adjudicated the child to be neglected. While the adjudication of neglect was based upon the respondent's belief that the child was untruthful, in finding that belief unreasonable, the court necessarily had to determine the child's truthfulness. The child's truthfulness, as argued by the respondent, was, therefore, the ultimate issue of fact.

" 'Generally, expert testimony is admissible if (1) the witness has special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues.' *State* v. *Kemp,* 199 Conn. 473, 476, 507 A.2d 1387 (1986)." *State* v. *Lamme,* 19 Conn. App. 594, 603, 563 A.2d 1372 (1989). As a general rule, however, " '[a]n expert witness is not ordinarily permitted to express an opinion on an ultimate issue of fact which is to be decided by the trier of fact. *State* v. *Vilalastra,* 207 Conn. 35, 41, 540 A.2d 42 (1988); *Kowalewski* v. *Mutual Loan Co.,* 159 Conn. 76, 80, 266 A.2d 379 (1970). . . .' " *State* v. *Lamme,* supra.

In cases involving a child's claim of sexual abuse, our state Supreme Court has allowed expert testimony relating to the general credibility of the child victims. See *State* v. *Spigarolo,* 210 Conn. 359, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). *Spigarolo* held that "expert testimony that minor victims typically fail to provide complete or consistent disclosures of the alleged sexual abuse is of valuable assistance to the trier in assessing the minor victim's credibility." Id., 378. The court noted, however, that the expert was not asked "about the credibility of the particular victims in [the] case, nor did she testify as to their credibility. The cases that have considered this issue have noted the *critical distinction between admissible expert testimony on general or typical behavior* patterns of minor victims *and inadmissible testimony directly concerning the particular victim's credibility.* See *United States* v. *Azure,* [801 F.2d 336, 340 (8th Cir. 1986)] (forbidding expert testimony on the credibility of the present victim); *State* v. *Lindsey,* [149 Ariz. 472, 475, 720 P.2d 73 (1986)] (direct expert testimony on credibility of particular child inadmissible); *Wheat* v. *State,* 527 A.2d 269, 275 (Del. 1987) (admitting expert testimony on general character of abuse victims but prohibiting testimony on specific victim's veracity); *People* v. *Foreman,* [161 Mich. App. 14, 24, 410 N.W.2d 289 (1987)] (testimony that it is common for child sexual abuse victims to delay reporting of incidents admissible because expert did not opine on whether particular children were truthful); *State* v. *Hicks,* [148 Vt. 459, 462, 535 A.2d 776 (1987)] supra, 462 (testimony admissible where it concerned whether delay in reporting common but no opinion on victim's credibility); but see *State* v. *Kim,* 64 Haw. 598, 609, 645 P.2d 1330 (1982) (expert opinion may reveal to trier characteristics of particular witness which may assist assessment of credibility); *State* v. *Myers,* 359 N.W.2d

604, 609–10 (Minn. 1984) (admitting expert opinion on victim's credibility); *State* v. *Geyman,* 729 P.2d 475, 479 (Mont. 1986) (expert opinion admissible to assist jury on credibility of particular child)." (Emphasis added.) *State* v. *Spigarolo,* supra, 379.

This case is analogous to that of *United States* v. *Azure,* supra, 339, where the government offered the expert opinion of a pediatrician specializing in child abuse that the victim was truthful. The court in *Azure* held that this expert testimony improperly invaded the factfinder's exclusive function of assessing witness credibility. Id.

In the present case, as in *Azure,* the expert testimony fell into the category of testimony directly concerning the particular child's credibility. We conclude, therefore, that the trial court improperly admitted this testimony. In this case, however, the court was the trier of fact, and, therefore, had the task of determining credibility and of determining whether the respondent was reasonable in her belief that the child was untruthful. Because the trial court found that the child was a "most credible witness" and therefore did not base its conclusions on the testimony of the experts as to the child's truthfulness, the error was harmless in this case.

## V

The respondent's final claim is that the court and DCYS acted contrary to Connecticut public policy as set forth in General Statutes § 17-38a (a), when they failed to reunite the family after the stepfather was acquitted of the criminal charges that resulted from this alleged abuse. We do not agree.

General Statutes § 17-38a (a) provides that "[t]he public policy of this state is: *To protect children* whose health and welfare may be adversely affected through injury and neglect; *to strengthen the family and to make*

*the home safe for children* by enhancing the parental capacity for good child care . . ." (Emphasis added.) While it is clear that the public policy of this state is to preserve family integrity, "[i]t must be stressed . . . that the right to family integrity is not a right of the parents alone, but 'encompasses the reciprocal rights of both parents and children.' " *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 284, 455 A.2d 1313 (1983). " 'The primary concern of DCYS is the safety of [the child]. Family integrity can be the goal of DCYS *only when such a reunion will not endanger the safety of the child.' "* (Emphasis added.) *In re Christine F.,* supra, 368.

The respondent relies on the stepfather's acquittal to support her claim that the child was in no danger in returning to the family home. She argues that because the stepfather was acquitted, the DCYS should have been collaterally estopped from proceeding with the neglect hearing, and the child should have been returned home.

Collateral estoppel has been defined by our Supreme Court as " ' "that aspect of the doctrine of res judicata which serves to estop the relitigation by parties and their privities of any right, fact or legal matter which is put in issue and has been determined by a . . . court of competent jurisdiction." ' " *State* v. *Fritz,* 204 Conn. 156, 172, 527 A.2d 1157 (1987).

Evidence of a judgment of acquittal in a prior criminal case may not be used as proof in a subsequent civil case that the act comprising the crime was not committed. *Griffin* v. *Parker,* 22 Conn. App. 610, 619–620, A.2d (1990); *McKenna* v. *Whipple,* 97 Conn. 695, 701, 118 A. 40 (1922); see also *Palma* v. *Powers,* 295 F. Sup. 924 (M.D. Ill.) (1969).

The judgment is affirmed.

In this opinion the other judges concurred.