938 P.2d 178

**In the Interest of DOE CHILDREN:
Jane Doe, born on July 18, 1988, and
Jane Doe, born on August 14, 1989.**

**No. 18942.**

Intermediate Court of Appeals of Hawai'i.

April 30, 1997.

Brian Custer, Honolulu, on the briefs, for mother-appellant.

Jay K. Goss and Kenneth Enright, Deputy Attorneys General, on the brief, for Department of Human Services-appellee.

Marguerite B. Simson, Honolulu, Guardian ad Litem, joinder in the answering brief.

Ronald P. Tongg, Honolulu (Tongg and Tongg, of counsel), joinder in the answering brief, for father-appellee.

Before BURNS, C.J., WATANABE and KIRIMITSU, JJ.

BURNS, Chief Judge.

In this Child Protective Act case, the mother (Mother) of Jane Doe, born on July 18, 1988 (Daughter A), and Jane Doe, born on August 14, 1989 (Daughter B), appeals the family court's November 30, 1994 Orders Concerning Child Protective Act which terminated jurisdiction in FC–S No. 93–03106, the Child Protective Act case. Mother also appeals the family court's March 29, 1995 Orders Concerning Child Protective Act which denied her motion for reconsideration. We vacate and remand.

The family court's orders on appeal were based on the requirements of the following part of Hawai'i Revised Statutes (HRS) § 587–72 (1993):

(c) Upon each review hearing the court shall consider fully all relevant prior and current information . . ., and

(1) Determine whether the child's family is presently willing and able to provide the child with a safe family home without the assistance of a service plan and, if so, the court shall terminate jurisdiction.

### FACTS

In the related divorce case, FC–D No. 88–0145, the October 27, 1989 divorce decree terminated the marriage between Mother and father (Father) and awarded Mother custody of Daughter A and Daughter B, subject to Father's rights of reasonable visitation. Mother, Daughter A, and Daughter B lived with Mother's son (Half–Brother) who was age 15 in November 1993 and Mother's daughter (Half–Sister) who was age 14 in November 1993.

The Child Protective Act case involving Half–Brother is FC–S No. 92–02732. The Child Protective Act case involving Half–Sister is FC–S No. 93–03105.

In the Child Protective Act case on appeal, FC–S No. 93–03106, the November 9, 1993 HRS Chapter 587 (1993) petition by the State of Hawai'i Department of Human Services (DHS) alleged that, on November 1, 1993, when Mother was arrested and sent to Castle Medical Center for psychiatric evaluation, Daughter A and Daughter B were placed in temporary foster custody.

On November 12, 1993, the family court appointed Marguerite B. Simson (Simson) as Guardian ad Litem (GAL) for Daughter A and Daughter B.

The family court's December 16, 1993 Orders Concerning Child Protective Act decided in relevant part as follows:

THEREFORE, IT IS HEREBY ORDERED THAT:

\* \* \*

1 [Daughter A and Daughter B] and parties come/s under the exclusive jurisdiction of the Family Court pursuant to HRS 571–11(9) and 587–11;

2 DHS is awarded foster custody over [Daughter A and Daughter B.]

On January 21, 1994, Mother's first court-appointed counsel moved to withdraw as counsel. The family court's February 15, 1994 order granted the motion.

The family court's January 25, 1994 Orders Concerning Child Protective Act ordered the January 5, 1994 Service Plan into effect. The goal of this plan was "to provide a safe and stable placement for [Daughters A and B] with [Mother or Father]."

On February 28, 1994, Father moved for the appointment of a GAL for Mother because "she is presently on medication and such medication is influencing her ability to understand the consequences of her actions[.]" The family court's March 4, 1994 order denied Father's motion.

Father, on May 13, 1994, in FC–D No. 88–0145, filed a motion seeking the award to him of the custody of Daughter A and Daughter B, subject to Mother's specified visitation rights. The DHS and the GAL were not parties in FC–D No. 88–0145. At the May 23, 1994 hearing on the motion, Mother, the DHS, and the GAL were not present or represented. The family court's May 25, 1994 order awarded custody of Daughter A and Daughter B to Father. The fact that a decision on Mother's rights of visitation was deferred pending resolution of FC–S No. 93–03106 clearly shows that the family court, acting in FC–D No. 88–0145, was aware of

the family court orders in FC–S No. 93–03106.

After the family court in FC–D No. 88–0145 awarded Father the custody he was seeking, Father moved, in FC–S No. 93–03106, on July 8, 1994 "to revoke family supervision and to terminate jurisdiction."

On July 13, 1994, Mother's second court-appointed counsel moved to withdraw from the case. This motion was granted on July 14, 1994.

On August 31, 1994, Mother's third court-appointed counsel moved to withdraw from the case and moved for the appointment of a GAL for Mother. On September 7, 1994, the first request was granted and the second request was denied.

On September 19, 1994, Mother's fourth court-appointed counsel filed a motion for the appointment of a GAL for Mother. On September 20, 1994, the motion was denied. The court stated in relevant part as follows:

THE COURT: Well, you know, I understand very clearly why you're bringing these motions. The only problem is this, she's not going to cooperate with any GAL. I know that. You know, I have no doubt about that fact.

And if I appointed a GAL and a GAL told me, Judge, we need to put her in restraints and have her take medication, you think I'm going to order that? No way. I won't, you know.

And the other thing is, she's borderline. I believe she understands what's going on in these proceedings. And it's just that she is not incompetent. She's not incompetent to do, you know—she just wants to advocate a point a certain way and she won't be turned from doing that.

* * *

This woman pretty much knows what she's doing. She's just a very very adamant type of person. And I know that she has a mental disorder, but it's not to the extremist degree that she doesn't understand what's going on. And that's the problem.

And I would be more than happy, [Mother's Counsel], to put another attorney/GAL in this case if I thought it would help. But in [Mother's] case it will not. She'll just threaten the GAL and she will not do anything.

And even if—again, I have to reiterate, even if the GAL says that she should be forced to take medication, I don't think you'll get any Family Court judge—you can go from courtroom to courtroom—is going to order her or force her to take medication.

And, you know, the medication, I don't know what degree it's going to help her, because as far as I'm concerned she's not really that far gone that she can't make, you know, fairly good decisions about what she wants having to do with the kids.

* * *

And the motion to appoint guardian ad litem unfortunately based on the facts and circumstances of this case and what I know of your client, [Mother's Counsel], she will not cooperate or utilize the services of the guardian ad litem.

And I do not believe that she's incompetent and does not understand the proceedings.

On September 19, 1994, Mother filed Mother's Motion for Court to Order the Production of [Half–Brother and Half–Sister] for Pre-trial Interviews and as Witnesses at Trial. On September 20, 1994, the request for pre-trial interviews was denied. The court ordered the presence of Half–Brother and Half–Sister at the trial.

The next motion [is] for the production of [Half–Brother and Half–Sister] for pre-trial interviews and witnesses at trial. As far as producing them for pretrial interviews, that's denied.

This Court has never been of a position that children—no matter what their age—should be subject to interviews by anybody except for the guardian ad litem and the court itself.

As far as being witnesses at trial, I'll order that they be produced. As far as my ruling have—if I were to be the trial

Judge—I would never allow a child to be cross examined in court. However, I'll leave it to the trial Judge. I want the children present.

If the trial Judge is inclined to speak with them in chambers—that's the only way basically the children as far as I'm concerned in my court—would be heard.

I—I understand your arguments as to due process and rights of witnesses, but even if these children are fourteen and fifteen, I would not be a party to letting them think that they had anything to do with the decision of the court, that's far to [sic] heavy a burden for children of any age to carry.

The trial was held on September 22 and 23, 1994. The court commenced the trial in chambers and in the presence of only GAL Simson when it first interviewed Half–Brother and then, after Half–Brother exited, interviewed Half–Sister. The family court clerk's minutes state that "the testimony of the children will be kept confidential and that testimony is made a part of the record but will be sealed. No portion of that testimony to be disclosed to any party without order of the court. The children's testimony and transcript and record of testimony to be sealed." [1] Thereafter, other witnesses testified in court in the traditional manner in the presence of the parties and their counsel.

The GAL testified in relevant part as follows:

If I were to write a report today it would be almost diametrically opposed to the July report in that both [Half–Sister] and [Half–Brother] have indicated to me within the last week that they intend, wish and are comfortable with staying in the home of [Father] for the foreseeable future.

\* \* \*

And the interaction between [Father] and the two younger children is something that is—completely appropriate and has been from the beginning.

On September 26, 1994, the family court announced its decision. On October 20, 1994, pursuant to HRS § 571–54, Mother filed her Motion for Reconsideration of Decision. On November 30, 1994, the family court entered its Orders Concerning Child Protective Act in relevant part as follows:

Based upon the record and/or the evidence presented, the court finds that:

A. [Father], father over [Daughters A and B], and stepfather over [Half–Brother and Half–Sister], has a safe family home;

\* \* \*

G. In the best interests of these children, physical and legal custody is best with [Father];

\* \* \*

P. [Mother's] inconsistent emotional state has led her children, who all love her, at the same time [to] fear her;

\* \* \*

R. Dr. Brenda Wong's diagnosis of Cyclothymia, a mood disorder is persuasive. This diagnosis is substantiated not only by Dr. Wong's assessment and reports but also by reports from the children to the guardian ad litem, reports made by the neighbors, and by [Father];

S. [Mother's] mood swings have caused her children to fear her at times, and have caused [Mother] to act in detriment to the best interests of the children;

THEREFORE, IT IS HEREBY ORDERED THAT:

1. Hawai'i Revised Statutes (HRS) § 587–42 (1993) states in relevant part as follows:

**Evidence may be inadmissible in other state actions or proceedings; testimony by a child.** (a) Any testimony by or other evidence produced by a party in a child protective proceeding under this chapter, which would otherwise be unavailable, may be ordered by the court to be inadmissible as evidence in any other state civil or criminal action or proceeding, if the court deems such an order to be in the best interests of the child.

1. The prior award of family supervision over [Daughter A and Daughter B] is revoked;

2. Jurisdiction is terminated;

3. Visitation of mother with [Daughter A and Daughter B] shall be supervised until further order of the court, and shall be at the Department of Human Services' discretion with input from the guardian ad litem;

\* \* \*

5. The Court denies [Mother's] request through counsel's written closing argument that she be appointed a guardian ad litem[.]

On March 29, 1995, the family court entered its Orders Concerning Child Protective Act in relevant part as follows:

Based on the record and/or evidence presented, the Court finds that:

A. Mother was not denied Due Process when this Court denied her expert witness to interview the children.

1. It was within the Court's discretion to deny mother's expert witness the opportunity to interview the children; furthermore, the Court has the authority by statute to be allowed to interview the children in chambers.

B. Mother was not denied Due Process when the Court denied her motion for a GAL.

1. This Court has found that an appointment of a GAL for mother in this case would not have made a difference;

2. While the Court does find mother to have a mental illness, her mental illness does not render her a danger to herself or others to qualify for a GAL[.]

## DISCUSSION

■ "It is well settled that the fundamental liberty interest in the care, custody, and control of one's children may not be changed by the state without due process of law." *Matter of Juvenile Action No. JS–7499*, 163 Ariz. 153, 158, 786 P.2d 1004, 1009 (Ct.App. 1989) (citations omitted).

Although the interests of the child are of paramount concern, the parents have a cognizable and substantial interest in the child which is constitutionally protected, and there must be proper regard for their due process rights. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Halsted v. Sallee*, 31 Wash.App. 193, 639 P.2d 877 (1982).

*In re Welfare of McGee*, 36 Wash.App. 660, 663, 679 P.2d 933, 935 (Wash.Ct.App.1984).

Each of Mother's points on appeal contend that she was denied her state and federal constitutional procedural due process rights. A decision on that issue involves a balancing of the following competing interests:

[F]irst, the private interest that will be affected by the official state action; second, the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of the additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).

### I.

■ Mother contends that she was denied due process when a GAL was not appointed for her. We disagree.

First, Mother was provided with a court-appointed attorney. Second, HRS § 587–34(d) (1993) states as follows:

(d) When the court determines, after such hearing as the court deems to be appropriate, that a party is incapable of comprehending the legal significance of the issues or the nature of the child protective proceedings, the court may appoint a guardian ad litem to represent the interests of that party; provided that a guardian ad litem appointed pursuant to this section shall investigate and report to the court in writing at six month intervals, or as is otherwise ordered by the court, re-

garding the current status of the party's disability, including, but not limited to, a recommendation as to available treatment, if any, for the disability and a recommendation concerning the manner in which the court should proceed in order to best protect the interests of the party in conjunction with the court's determination as to the best interests of the child.

The primary issue in this case was whether Father was "presently willing and able to provide [Daughter A and Daughter B] with a safe family home without the assistance of a service plan[.]"

Mother's request for a GAL presented the question whether Mother was "incapable of comprehending the legal significance of the issues[.]" Although it did not do so in writing, the family court orally answered this question in the negative.

Mother's Amended Opening Brief states that "[b]ecause her psychiatric problems were not treated, Mother went through four different attorneys all of whom attempted to withdraw from representing her." Her Reply Brief states that "a GAL was needed to file a motion to have Mother involuntarily committed so that she could receive appropriate medication." In other words, Mother desired a GAL to effect treatment for her psychiatric problems or to cause her to receive appropriate medication. However, those are not proper purposes for a GAL. The way to accomplish that purpose is pursuant to HRS Chapter 334 (1993) which states in relevant part as follows:

§ 334–1 **Definitions.** As used in this chapter unless otherwise indicated by the context:

\* \* \*

"Mentally ill person" means a person having psychiatric disorder or other disease which substantially impairs the person's mental health and necessitates treatment or supervision.

\* \* \*

§ 334–60.2 **Involuntary hospitalization criteria.** A person may be committed to a psychiatric facility for involuntary hospitalization, if the court finds:

(1) That the person is mentally ill or suffering from substance abuse;

(2) That the person is imminently dangerous to self or others, is gravely disabled or is obviously ill; and

(3) That the person is in need of care or treatment, or both, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization.

§ 334–60.3 **Initiation of proceeding for involuntary hospitalization.** (a) Any person may file a petition alleging that a person located in the county meets the criteria for commitment to a psychiatric facility. The petition shall be executed subject to the penalties of perjury but need not be sworn to before a notary public.... If the petitioner believes that further evaluation is necessary before commitment, the petitioner may request such further evaluation.

II.

Mother contends that she was denied due process when (A) her attorney was not allowed to cross-examine Half–Brother and Half–Sister at the trial; and (B) her expert, a Ph.D. in social work, was not allowed to interview Half–Brother and Half–Sister as part of Mother's pre-trial investigation.

(A)

■ As does Article 1, Section 14, of the State of Hawai'i Constitution,

[t]he United States and Arizona constitutions guarantee *criminal defendants* the right to confront their accusers. But this right belongs solely to the accused in a criminal prosecution. It has no direct application in proceedings to terminate parental rights, which are essentially civil in nature.

*Matter of Juvenile Action No. JS–7499,* 163 Ariz. at 157, 786 P.2d at 1008 (citation and footnote omitted).

HRS § 587–42(b) (1993) states as follows:

(b) The court may direct that a child testify under such circumstances as the court deems to be in the best interests of the child and the furtherance of justice, which may include, or be limited to, an interview on the record in chambers with only those parties present as the court deems to be in the best interests of the child.

Thus, in this context, Hawai'i generally agrees with the view that

when the rights of parents and the welfare of their children are in conflict, the welfare of the minor children must prevail. *In re Pawling,* 101 Wash.2d 392, 399, 679 P.2d 916 (1984) (quoting *In re Sego,* 82 Wash.2d [736,] 738, 513 P.2d 831 [1973]).

*In re Welfare of S.E.,* 63 Wash.App. 244, 250, 820 P.2d 47, 50 (Ct.App.1991) (internal quotation marks omitted).

Mother asserts the view that

absent stipulation of the parties, parents are denied due process of law when refused the right to cross-examine their children during a dependency hearing. We recognize, however, there may be instances in which the court may wish to limit the conditions under which children are examined by providing that examination be in chambers or by providing that only counsel for the parties be present. Testimony which is traumatic in nature would merit an examination in chambers, and the presence of counsel alone would be justified where a party's presence is potentially inhibiting. Such reasonable limitations would protect the emotional interests of the child while preserving the parents' due process right of cross-examination.

*Matter of Maricopa Cty. Juv. Action No. JD–561,* 131 Ariz. 25, 28, 638 P.2d 692, 695 (1981).

Similarly, Mother cites *In re Noel M.,* 23 Conn.App. 410, 580 A.2d 996, 1002 (1990), and asserts the view that

the procedure used in questioning nine year old child in neglect hearing, under which court allowed all parties to submit questions and areas of concern for examination, court questioned children, and mother's counsel, but not mother, was present, and court allowed parties to submit additional questions during examination, did not deprive mother of her statutory rights to confrontation and cross examination.

The State responds that

[t]he issue of custody was not before the court since Father had already been awarded legal and physical custody in the FC–D case. The issue of termination of parental rights was never an issue. The *only* issue that was being decided by the trial court was whether the family court should continue to exercise its jurisdiction over the family.

Under the holding of the cases cited above, the issue is whether the private interest at stake outweighed protecting the children from having to testify. The private interest at stake that Mother is trying [to] assert in this case is the "right" to have the court to continue to exercise its jurisdiction under Chapter 587 in direct violation of HRS § 587–72(c)(1). This "right" that Mother is trying to assert, does not involve any of the substantial rights of care and control of one's family that were an issue in the cases cited above. If jurisdiction under Chapter 587 is terminated, Mother does not lose any parental rights. Whether the court continues to have jurisdiction under Chapter 587 has no bearing on the issue of whether Mother or Father have custody of the children. Father was awarded legal and physical custody of the children in the divorce case and with an appropriate motion Mother can always ask the court in the divorce case to modify the divorce decree to give her custody. Unlike the cases cited above, the "right" to have the court continue to exercise its jurisdiction under the circumstances in this case, simply did not exist. A family court judge had already made a determination that Father was an appropriate legal and physical custodian in the FC–D case. The court in the FC–S case properly honored this prior ruling and considered the positions of DHS and the children's GAL and properly proceeded pursu-

# 126

ant to HRS 587–72(c)(1) and closed the case.

We disagree with Father. First, in FC–S No. 93–03106, the following relevant events occurred: On November 12, 1993, the family court appointed a GAL for Daughter A and Daughter B; and on December 16, 1993, the family court decided that Daughter A and Daughter B came under its jurisdiction pursuant to HRS §§ 571–11(9)[2] and 587–11[3] (1993) and awarded the DHS foster custody over Daughter A and Daughter B. Consequently, until the family court terminated its Child Protective Act jurisdiction in FC–S No. 93–03106, it retained that jurisdiction.

The family court's subsequent May 25, 1994 order in FC–D No. 88–0145 awarded Father physical custody of Daughter A and Daughter B. It appears that the May 25, 1994 order in FC–D No. 88–0145 was entered without notice to and without the participation of the DHS and the GAL and thus did not terminate the DHS' foster custody over Daughter A and Daughter B.

Second, notwithstanding the May 25, 1994 order in FC–D No. 88–0145, the issue in FC–S No. 93–03106 was whether Father was then "presently willing and able to provide [Daughter A and Daughter B] with a safe family home without the assistance of a service plan." No matter what the family court did in FC–D No. 88–0145, the family court could not terminate its jurisdiction in FC–S No. 93–03106 if it answered that question in the negative. The family court's November 30, 1994 Orders Concerning Child Protective Act which terminated jurisdiction in FC–S No. 93–03106 answered that question in the affirmative. The private interest Mother was asserting was her right to contest placement of her children with a custodian she alleged was not presently willing and able to provide them with a safe family home without the assistance of a service plan.

**2.** HRS § 571–11 (1993) states as follows:

> **Jurisdiction; children.** Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:
> \* \* \*
> (9) For the protection of any child under chapter 587.

**3.** HRS 587–11 (1993) states as follows:

> **Jurisdiction.** Pursuant to [section] 571–11(9), the court shall have exclusive original

On the other hand, we are talking about the teenage son and daughter of Father being witnesses on the factual question whether Father was then "presently willing and able to provide [their half-siblings, Daughter A and Daughter B] with a safe family home without the assistance of a service plan."

Balancing the interests, we agree with Mother that when Half–Brother and Half–Sister were questioned in the court's chambers, Mother had the due process right to one of the following or similar scenarios:

> [A]ppellants were required to submit the questions they wished to ask the minor in written form prior to the examination, and appellants' attorney was to question the minor in chambers with only the minor and the minor's therapist present. Appellants, the referee, and all other parties and counsel viewed the examination on closed circuit television as it took place. All parties agreed that if the interview appeared to be affecting the minor adversely, it would be terminated[.]

*Matter of Pima County Severance Action,* 159 Ariz. 302, 306, 767 P.2d 25, 29 (Ct.App. 1988).

> The trial court questioned the child in chambers with all counsel, the court monitor and a DCYS social worker present. All questioning was done by the court, but counsel was provided with the opportunity to submit questions in advance. Much of the questioning was based on the questions submitted by counsel. Pursuant to Practice Book § 1042(7), the respondent was not present.

*In re Noel M.,* 23 Conn.App. 410, 420, 580 A.2d 996, 1001 (1990).

### (B)

██ Mother contends that she was not permitted to adequately prepare for trial

> jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

when her expert was not allowed to interview Half–Brother and Half–Sister prior to trial. *Matter of Maricopa Cty. Juv. Action No. JD–561*, 131 Ariz. 25, 638 P.2d 692 (1981). Balancing the interests, we agree with the family court that the sources of information for Mother's expert were the relevant adults, including the GAL, but not Half–Brother and Half–Sister.

## CONCLUSION

Accordingly, we vacate the family court's November 30, 1994 Orders Concerning Child Protective Act and the March 29, 1995 Orders Concerning Child Protective Act and remand for further action consistent with this opinion.