[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 3551
NATURE OF PROCEEDINGS.
On October 25, 1991, the Department of Children and Youth Services (DCYS) filed a petition to terminate the parental rights of Steven B. Sr., and Cathy B. in their daughter Jennifer B., born October 6, 1983. This petition applies to children previously committed to DCYS as neglected, abused or uncared for pursuant to Sections 46b120 and 46b129 of the Connecticut General statutes all of which have existed for more than one year.
1. Failure to personally rehabilitate.
2. Parental acts of commission or omission.
3. There is no ongoing parent-child relationship.
Before proceeding to the merits of the DCYS allegations, mention should be made of the structure of a termination proceeding. A petition to terminate parental rights consists of two phases, adjudicatory and dispositive, Connecticut Practice Book Sections 1042, 1044, 1049. The two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in this case is permissible. (84-A8), 192 Conn. 254, 259 (1984).
Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged, and hence, is limited to facts and events which occurred before the filing of the amended petition on November 18, 1992. The dispositive phase is concerned with what action should be taken in the best interest of the child, and as to that phase, the court may consider matters occurring up to the end of the trial on February 24, 1993. In Re: Juvenile Appeal, (84-AB), supra, at 267, 268, n. 19. The dispositive phase is not reached unless at least one of the grounds alleged in the petition is proved by clear and convincing evidence. Connecticut General Statutes 17a-112(b).
The termination of parental rights is "a most serious and sensitive judicial action," In Re: Jessica M., 217 Conn. 459 at 464, quoting from Anonymous v. Norton, 168 Conn. 421, 430,362 A.2d 532, cert. denied, 4223 U.S. 935, 96 S.Ct. 294 46 L.Ed.2d 268
CT Page 3552 (1975). me interest of parents in their children is a fundamental constitutional right, In Re: Jessica M., supra at 464. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. In Re: Jessica M., supra at 465, quoting from Santosky v. Kramer,455 U.S. 745, 573, 102 S.Ct. 1388 71 L.Ed.2d 599 (1982).
Consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination of parental rights; In Re: Barbara J.,215 Conn. 31, 45, 574 A.2d 203 (1990); In Re: Luis C., 210 Conn. 157,165, 554 A.2d 722 (1989); In Re: Juvenile Appeal (Anonymous) v. Commissioner of Children and Youth Services, supra, 67-72; "insistence upon strict compliance with the statutory criteria before termination . . . can occur is not inconsistent with concern for the best interest of the child." In Re: Juvenile (Anonymous v. Commissioner of Children and Youth Services, supra, 671-72; "[i]nsistence upon strict compliance with the statutory criteria before termination . . . can occur is not inconsistent with concern for the best interest of the child." In Re: Juvenile Appeal (Anonymous v. Commissioner of Children and Youth Services, supra, 672. "A child is no less than a parent, has a powerful interest in the preservation of the parent-child relationship. Santosky v. Kramer, supra, 760." In Re: Jessica M., supra, 466. In Re: Baby Girl B., C.L.J., December 29, 1992.
On November 19, 1991, the respondent parents represented by a court appointed attorney, denied the allegations in the petition. The trial did not begin until August 19, 1992, continued for an additional eleven days, and on February 24, 1993 the parties rested.
DCYS called the following witnesses: Dr. Henry A. Allen, MD, a child psychiatrist at Riverview Hospital; Dr. Barbara Mason, MD, a child psychiatrist at Yale University Child Study Center; Bette Randlett, a psychiatric social worker; Jean Deckert, a psychiatric social worker; Bernadeen Gagnon, a group therapist; James McDermott, a teacher; Carolyn Smith, a teacher and Paul Sadowitz, MD, a child psychiatrist, all from High Meadows, a DCYS treatment facility.
The respondent parents both testified and called the following witnesses: Robert Reitman, a psychologist and family therapist; and Charles F. Yackulic, M. D., a child psychiatrist. CT Page 3553
The following exhibits were introduced in evidence by DCYS:
Exhibit A — Elmcrest Hospital Records
Exhibit B — Riverview Hospital Records
 Exhibit C — Summary Report by Bette Randlett, MSW Psychiatric Social Worker, High Meadows — 11/17/90
Exhibit D — High Meadows — Record of Conference — 1/10/91
 Exhibit E — Report by Bette Randlett, MSW of High Meadows — 5/15/91
Exhibit F — DCYS Treatment Plan — 6/10/91
Exhibit G — DCYS Treatment Plan Review — 8/12/91
 Exhibit H — Report of Jeanne Deckert to Yale Child Study Center, dated 5/16/91
 Exhibit I and J — Letters from Dr. Ruth Grant, Ph.D. filed 7/12/90 and 7/31/90
Exhibit K — DCYS Service Agreement, dated 5/8/90 — Five (5)
 Exhibits L, M, N, O, Q, Treatment Plans Five (5) DCYS Treatment Plans
Exhibit P — DCYS Inter Office letter Dated 6/18/92
 Exhibits R and S — Yale Child Study Evaluations by Dr. Barbara Mason, M.D. dated 5/14/92 and 6/19/92.
 Exhibit T — Records from Children and Family Services of Stamford.
Respondents Exhibit 1 — Evaluation by Dr. Charles F. Yackulic, M.D.
BACKGROUND FACTS
Based upon the DCYS social study filed with the petition, and other documentary evidence in the file, some of the facts and events that preceded this termination trial are not in dispute. In November 1989, the child had told a bus driver and a friend that CT Page 3554 she was in bed with her parents and they touched each other "private parts." This was reported to Mrs. Hazel Hubbs, the school principal at Hamilton Avenue School in Greenwich, Conn., who in turn referred the matter to DCYS. On December 1, 1989, Mrs. DeAngelo, a DCYS worker in Stamford, was assigned the case. She discussed the accusations with the mother, who denied them. On January 19, 1990, a sexual abuse interview was conducted at the Children and Family Service Clinic of Stamford. And again the child implicated the mother, father and a family friend named Nick of sexually interacting with her. She also indicated that her father put his penis inside her. That same day, Dr. Sanders Stein, M.D., ordered Jennifer placed in Elmcrest Psychiatric Hospital in Portland, Conn., by signing a ninety six hour physicians emergency certificate, diagnosed her to have poor impulse control, suicidal ideation and disorganized thinking. The parents consented to the placement but they were told she would be placed even without it. No physical examination was conducted to determine if the child had been sexually assaulted or molested. A Greenwich police officer was present at this interview but no criminal charges for sexual molestation or risk of injury to a minor were ever filed against the parents.
The child stayed at this psychiatric hospital from January 19 to March 20, 1990. During this period, Dr. Barbara Bunk, Ph.D., a sexual consultant at this hospital reported that Jennifer had "clearly experienced sexual trauma . . . but refused to disclose specific or detailed accounts of her experiences." When Dr. Bunk asked if anyone had touched her vaginal area she responded "my mommy and daddy". But the child refused to discuss any details of her experience. She displayed inappropriate sexual behavior to male staff and demonstrated knowledge of sexual behavior far beyond what would be usual for a child her age. During the two months at Elmcrest, her parents frequently visited their daughter. On March 20, 1990 Jennifer was discharged from Elmcrest.
After spending one week in a foster home, she was transferred to a second foster home, to be closer to her new therapist, Dr. Ruth Grant, Ph.D. in Weston, Conn. She attended kindergarten there as, an emotionally maladjusted child and was at times "out of control". Dr. Grant reported that Jennifer discussed many improper sexual themes, whereby DCYS terminated parental visitations. Because these foster parents could not manage her at home, so Dr. Grant had to admitted her to Bridgeport Hospital on August 30, 1990 on an emergency certificate on August 30, 1990. The following day the child was transferred to Riverview Hospital, a state CT Page 3555 psychiatric hospital for children in Middletown, Conn., where she remained until November 28, 1990. In her first testing session there with Dr. Bernard Barile, Ph.D., she described some sexual interaction with her father, but in later sessions denied that anyone had touched her. Then, on November 29, 1990, she was transferred to High Meadows, a DCYS Therapeutic School in Hamden, Conn., as an inpatient awaiting placement in a therapeutic foster home. On March 28, 1991 she was placed with the family where she remains to this date. She has now been at High Meadows for the past two years and three months. In March, 1991, Jennifer was physically examined at Yale-New Haven Hospital, which revealed normal findings.
Before considering the three grounds in this termination petition, the court will discuss the prior adjudication.
On January 25th, 1990, DCYS obtained an order of temporary custody and also filed an underlining petition of neglect under Sec. 46b-120 of the Connecticut General statutes, alleging that the child had been sexually abused. The petition stated that the parents had been naked in bed with the child and that "they touched each others private parts". Both parents denied these allegations.
On March 28, 1990, DCYS amended the petition from neglect to uncared for, and by doing so, caused some of the confusion and contention between DCYS and the respondent parents that continued for the next three years. The parents testified that they were told by DCYS and their attorney that by consenting to an uncared for adjudication they were not admitting the sexual abuse allegations. They understood that the child would be returned to them as long as they cooperated with the DCYS service agreements and the treatment plans. Relying on these representations, they consented to the uncared adjudication and the child was committed to DCYS for eighteen months. Under Sec. 46b-120 an "Uncared for" child is defined as "one whose home cannot provide the specialized care which his physical, emotional or mental condition require." This same statute, however, defines a neglected child as one that has been abused including sexual molestation, which is not defined in this statute. It is however defined in Sec. 53a-65 of the Connecticut General statutes, which is followed by serious sexual crimes such as rape, oral sex, and contact with the intimate parts of the body for sexual gratification. From the beginning and through the trial, these parents have consistently denied ever having sexually molested their daughter in any such manner. CT Page 3556
During the past three years the most significant underlying issue in dispute between DCYS and these parents involves their denial of sexual molestation. At trial, no evidence was presented that the mother ever sexually molested her. The evidence presented against the father was primarily based on unsworn accusations by his six year old child made to numerous psychologists and psychiatrists.
Dr. Sanders stein, M.D., conducted the initial interview with Jennifer on January 19, 1990, with a sexual abuse team, including a Greenwich Police Youth Officer. He diagnosed her having a psychosis and suffering from catastrophic stress. He found her disorganized in thought, impulsive and suicidal with the probable precipitating factors being sexual abuse. (emphasis supplied) She did not accuse the father of sexual molestation, and the child was not physically examined, nor were any criminal charges brought against him.
The next sexual evaluation was held at Elmcrest Hospital in February, 1990 and Jennifer was diagnosed as "extremely scattered, impulsive and disorganized". Later she was interviewed by Dr. Barbara Bunk, Ph.D., a sexual trauma consultant who concluded that Jennifer had "clearly experienced sexual trauma . . . but refused to disclose specific or detailed accounts of her experiences". In reply to whether anyone had touched her vaginal area, she responded "My Mommy and Daddy", but then refused to discuss any details.
In April, 1990, when Jennifer was moved into a foster home in Fairfield County, she began therapy with Dr. Ruth Grant, Ph.D., of Weston, CT., who testified that the child had suffered sexual abuse and had discussed with her details of both oral and vaginal sex, but did not identify the abusers. She recommended termination of further parental visits because of the devastating emotional distress these visits were causing. (State's Exhibits I and J.)
In September, 1990, while she was at Riverview Hospital, Dr. Alton A. Allen, M.D., a child psychiatrist, found that she introduced sexual themes in her play. She told Dr. Bernard J. Barile, Ph.D., of sexual interaction with the respondent father but later she denied that he ever touched her. (State's Exhibit A.)
In May, 1991, Dr. Paul Sadowitz, a child psychiatrist and consultant at High Meadows, reported that Jennifer would masturbate and discussed inappropriate sexual themes in group therapy sessions at school. She also discussed having sexual intercourse with her CT Page 3557 father. (State's Exhibit H).
Dr. Barbara Mason, M.D., a child psychiatrist at Yale University, interviewed the child, the respondent parents, and the foster parents between January and March, 1992, and reviewed all of the prior psychological evaluations and hospital records. The court ordered evaluations by Dr. Mason are dated May 14, 1992 and June 18, 1992 and in evidence as exhibits. (State's Exhibits R and S.) She reported that the respondent parents denied having sexually molested Jennifer and that there is no definite proof of it. However, because Jennifer's accusations of inappropriate sexual themes and actions, her advanced knowledge of sexual matters and her tendency to exhibit sexualized behavior when anxious, Dr. Mason concluded it was most likely that she has viewed highly stimulating experiences, and has probably been involved directly with them. (State's Exhibit R.)
The court has reviewed all the testimony and reports of the experts and given serious consideration to their opinions, but cannot find by clear and convincing evidence that either parent had sexually molested their daughter.
Another issue in dispute between DCYS and these parents is that by the parent's denying that they ever sexually molested her prevented them from being rehabilitated, and eventually reunited with their daughter. (See DCYS Social Study and Addendum) DCYS presented hours of testimony that counselling and other services were ineffective because the parents refused to admit these allegations.
At the Yale Child Study evaluation conducted in February, 1992 by Dr. Barbara Mason, M.D., and at trial, both parents admitted that they had kept pornographic video tapes and magazines in their home and that on several occasions Jennifer had looked at them. At this evaluation, the father admitted to having had sexual intercourse with his wife on one or two occasions when the child was in bed with them. He also made these same admissions to his psychiatrist, Dr. Charles F. Yackulic, M.D., (Defendant's Exhibit 1) At the interview, with Dr. Mason, the mother wondered whether two men, friends of the couple, who took the child on occasion to a nearby park, may have been sexually involved with her. The father testified of having seen Jennifer watching a pornographic movie and that she knew how to play these tapes herself on the VCR. At trial, both parents admitted that having these pornographic materials in their home and available to this six year old child CT Page 3558 was wrong. They now acknowledge that these materials and their behavior caused some of the severe emotional and sexual trauma she suffered over these past three years. They have removed or destroyed these pornographic videos and magazines from their home.
With this background, the court will consider the three grounds for termination alleged in their petition.
ADJUDICATION Facts from December 1, 1989 to November 18, 1992, the date the petition was last amended.
1. Failure to Rehabilitate
Under this first ground, DCYS must prove by clear and convincing evidence that the respondents failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, they could assume a responsible position in the life of the child. In Re: Luis C., 210 Conn. 157, 167 (1989). Personal rehabilitation means that a parent will be able to take a constructive and useful role in caring for the child. In Re: Davon M., 16 Conn. App. 693, 695 (1988). What is a reasonable period of time, considering the age and needs of the child, are questions of facts governed by the circumstances in each case. In Re: Rayna M.,13 Conn. App. 23, 36-37, (1987). In Re: Shannon S., 19 Conn. App. 20
(1989). In deciding whether a parent has been able to achieve personal rehabilitation and assume a responsible role in the child's life, the court must consider the six criteria listed in Sec. 17-112a(d) of the Connecticut General statutes and make written findings regarding them. In Re: Shavoughn K., 13 Conn. App. 91,98, (1987), In Re: Shannon S., 19 Conn. App. 20 (1989). In addition, the parents' success in fulfilling DCYS service agreements is relevant to such findings.
The court findings as to these six issues are as follows:
1. DCYS entered into a service agreement with the parents on May 8, 1990, (State's Exhibit K); which required them to attend family and individual counseling with Family and Children Services of Stamford. The mother met with a Carole Elias from August 16 to November 1, 1990. Her discharge summary stated that she was a "limited woman with poor ability to verbalize feeling." The mother testified however that Ms. Elias told her she had complied with the program and that she would not need any additional therapy until CT Page 3559 the child was returned to her. The father's therapist, Robert A. DeLello, met with him twelve times between June and October, 1990. And in his discharge summary, he reported that Mr. _____ had made little progress because of his refusal to admit involvement of sexually abusing his daughter. The father testified that he had problems communicating with him and felt that Mr. DeLello was "out to get him". After these parents had relocated from the Greenwich area to Brewster, New York, DCYS suggested that they contact a therapist there. But after being discharged by Family and Children Services, DCYS did not provide any further individual counseling services. The court finds that DCYS should have provided family counseling services at High Meadows, during the past two years prior to or following visitations because these parents had been compliant with whatever DCYS had required of them. DCYS also could have arranged for another counselor to provide individual or family therapy. (See Sec. 17a-101 and Sec. 17a-110(a)(1) Connecticut General statutes.)
Since the purpose of the service agreement, and the first two DCYS treatment plans was reunification, the parents were allowed supervised visits with Jennifer twice each month and to telephone her twice weekly. In the social study and treatment plans, DCYS conceded that the parents had complied with the visitations requirements. During the past two years and three months that Jennifer has been at High Meadows, these parents have traveled from Brewster, New York to Hamden, Connecticut, a distance of over of fifty miles each way and never missed a visit without a valid reason.
2. There were no court ordered expectations, only the service agreement of May 8, 1990. The parents voluntarily consented to the court ordered evaluation at the Yale Child Study Center in February, 1992 prepared by Dr. Barbara Mason, M.D., a child psychiatrist chosen by DCYS and complied with all other evaluations requested by DCYS. (State's Exhibit R and S).
3. The child was committed when she was six years only two months old, therefore, she had significant emotional ties to her parents. She has been with the present foster family, since March 28, 1991, approximately twenty three months, and also has developed significant emotional ties to them, According to the Yale evaluation by Barbara Mason, M.D., dated May 14, 1992, who interviewed the Jennifer referred to them as her "new Mom and Dad", and to the parents as her "old Mom and Dad" Yet after the first interview by Dr. Mason with the parents CT Page 3560 and the child, when the parents were leaving, Jennifer said, "I want to go home with them".
During the past two years, the parents have brought their two and one half year old son, Steven, Jr., to many of the supervised visits at High Meadows. In this petition, and at trial, DCYS has taken the position that the interaction between Jennifer and her parents at these visits is minimal and superficial, that she separates from them easily, and is not upset when they leave. The DCYS social study stated that Jennifer is more preoccupied with her baby brother than she is with them, and that she acts out negatively before and after these visits.
DCYS had told them it was improper for them to discuss with her about returning home. In spite of these instructions, she would ask them at each visit when she was coming home. She would hug and kiss them at the beginning or end of each visit according to the mother's testimony.
Obviously, DCYS and the parents disagree as to the nature of their parent-child relationship. Nevertheless, it is undisputed that Jennifer recognizes them as her parents and Steven, Jr., as her baby brother. The parents expressed strong feelings of love and affection for her and testified that they believe the child's feeling for them was mutual.
4. Jennifer was born on October 6, 1983, and is now nine years and four months old.
5. The efforts made by the parents to be reunited with Jennifer included participation in counseling and family therapy and visitation as previously discussed. (State's Exhibits K, L, and M). Beginning in May, 1992, to the present time, they have been attending weekly counseling and family therapy sessions with Robert Reitman, M.S.W., a psychologist and family therapist, of Croton Falls, New York., with twenty six years experience.
After working with them for seven months he believes they both now understand Jennifer's special needs and would be able to give her the love and structure that is now being given to her by the foster parents. (Testimony of Robert Reitman, transcript page 29.
He believes that these parents are truthful when they say they never molested her. But even if they had, these parents are CT Page 3561 now much more stable and able to understand her special emotional needs. In his opinion, they have been effective parents for their son Steven, Jr., during the past two and one half years, who love each other, live in a nice home, and are happily married. They are both receptive to receiving help. The mother is a loving homemaker while the father works eight to ten hours every day to support the family. He testified that neither of them have character or behavior disorders. They basically need help in education to understand how to cope with a troubled child as would any parent and are ready, willing and able to continue in therapy as long as needed. (Testimony of Robert Reitman, page 31, transcript, February 10, 1993).
6. These parents have not been prevented by DCYS, any other person or agency from maintaining a meaningful relationship with the child. The court previously stated that DCYS should have arranged for them to enter a family therapy program when they moved to Brewster, New York, and this failure, left them in limbo for the next two years. And by having all the bi-monthly visits at High Meadows supervised did not help to improve the trust and confidence between the parents and Jennifer.
The court found Mr. Reitman's and the parents testimony to be credible, probative, and persuasive and has reached the following factual conclusions as to this first ground.
1. They have made substantial progress in understanding Jennifer special needs during the past nine months that they have had weekly counseling and family therapy with Robert Reitman. And they are committed to continuing with him until the child is returned to them or as long as he feels they need it.
2. Their marriage has grown stronger and more stable during the past three years. They have properly cared for their two and one-half year old son, Steven, Jr., and nurtured him in a safe and suitable home, with love and affection. The father's steady employment has provided them with all their personal and physical needs.
3. They have no personality or characters disorders and have not been involved with the criminal justice system.
4. They have reformed from alcohol abuse and have recovered from this addiction by attending Alcoholics Anonymous. CT Page 3562
Based these factual findings, the Court finds that these parents have made substantial progress in personal rehabilitation to parent properly Jennifer. DCYS has failed to prove the first ground by clear and convincing evidence.
Acts of Commission or Omission:
The second ground alleged by DCYS for termination is that by reason of an act or acts of parental commission or omission, Jennifer has been denied the care, guidance or control necessary for her physical, educational, moral or emotional well-being. Conn. Gen. Stat. 17a-112(b)(3).
As previously stated in this decision, both respondent parents admitted keeping a collection of pornographic video tapes and magazines in their home and that Jennifer had watched them. The father admitted to Dr. Mason that he had sexual intercourse with his wife on one or two occasions while Jennifer was in their bed. Both their witnesses, Mr. Robert Reitman, a psychologist, and Dr. Charles Yackulic, M.D., a psychiatrist, testified that this exposure could have significantly contributed to the severity of this child's emotional illness. Mr. Reitman testified that they now understand that exposing her to these pornographic materials and their sexual intercourse was bizarre and unacceptable behavior and is sexual abuse. They destroyed these materials and believes that it will never happen again. Mr. Reitman answers on whether the parents sexual behavior and her exposure to the pornographic video tapes would have caused the child such severe mental illness, he stated as follows: (See transcript, Mr. Reitman page 38 — 2/10/93).
A: "I have no question in my mind that these are extremely traumatizing events and by themselves, they are absolutely enough to cause all the damage that has been reported to have been caused, although I do believe this child was troubled even before this, okay.
But all — everything that's been written that the child has said, if you've read any literature in this field, and I have a book with me by a famous psychiatrist from the top people in the field that talks exactly about this, you expose a child to inappropriate sexual matter, you're way overstimulating this child. And for the child to be able to separate what they've seen from fantasies they have, especially at the age of six where there's a lot of Oedipal stuff going on, about their parents, is expecting CT Page 3563 way too much."
Q. Would this be the case even if the exposure was limited to just a handful of times?
A. One time is enough.
From the testimony of Mr. Reitman and Dr. Charles F. Yackulic, M. D., a child psychiatrist, both witnesses for the parents, and from the admissions by them of exposing her to pornographic video tapes and to having sexual intercourse in her presence the court finds that these acts significantly contributed to the severity of Jennifer's emotional illness. The court finds that by reason of these acts of commission, this second ground has been proven and established by clear and convincing evidence. They must accept the responsibility for these acts of sexual abuse that caused this child such severe emotional trauma.
III. No Ongoing Parent Child Relationship
The third ground alleged by DCYS was the absence of an ongoing parent-child relationship. Connecticut General Statutes 17a-112(b)(3). Here, DCYS must establish by clear and convincing evidence (1) that no ongoing parent-child relationship exists and (2) that the allowance of further time for the establishment or re-establishment of such relationship would harm the best interest of the child.
The Connecticut Supreme Court considered this ground in In Re: Juvenile Appeal (Anonymous), 181 Conn. 638 (1980), citing with approval in earlier decision in In Re: Juvenile Appeal, 177 Conn. 648
(1979). The court stated:
 "It is reasonable to read the language of "no-ongoing parent/child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence, it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feeling CT Page 3564 for the natural parent".
 In Re: Juvenile Appeal (Anonymous), 181 Conn. at 645-646. At the present time, the terms "memories of" and "feelings for" refer to specific memories and positive feelings. In Re: Rayna M., supra, 13 Conn. App. at p. 34-35, 534 A.2d 897; In Re: James T., 9 Conn. App. 608, 616, 520, A.2d 644 (1987); the existence of positive feelings depend upon the viewpoint of the child. See, In Re: Rayna M., supra.
During the three years that the child has been in placement, DCYS has allowed the parents supervised visits twice each month and to have telephone contact with her two times each week. The social study prepared by the DCYS case worker, Mrs. Daymonde, confirmed by her testimony, is that the parents have complied with the bi-weekly visitation schedule for the past three years and have maintained weekly telephone contact with their daughter on the week they didn't visit her. The parents also have brought their younger son, Steven, Jr., to visit Jennifer on occasions. DCYS had taken the position that the interaction between Jennifer and her parents is minimal and superficial. Mrs. Daymonde related that Jennifer is more preoccupied with Steven Jr., than with her parents and that they seldom properly interact with her. She feels that Jennifer acts out negatively before and after these visits. DCYS had also told the parents not to discuss with Jennifer about returning home.
On the other hand, both parents testified that Jennifer herself asks them every time they visited when she would be coming home. She would hug and kiss them at the beginning of each visit and indicated that she enjoyed playing with her baby brother. It is undisputed that Jennifer knows her parents and brother and has positive feelings for them.
The positive feelings of the child's is controlling. In Re: Jessica, 217 Conn. 459 (1991). The court finds that after considering all of the evidence, Jennifer has strong positive feelings for her parents, therefore, DCYS has failed to prove this third ground.
DISPOSITION: Facts from November 18, 1992 to the end of the trial. CT Page 3565
Having proved one of the three grounds, DCYS must now prove by clear and convincing evidence that the termination sought by DCYS is in Jennifer's best interest. Section 17a-112(b) Connecticut General statutes. As previously stated, our Supreme Court has repeatedly pointed out that both the parents and the child have fundamental constitutional rights in the preservation of the parent-child relationship. Even when a child has been adjudicated uncared for and a finding of sexual abuse is established, as was in this case, the parents and the child retain a vital interest in preventing the irretrievable destruction of their family life. In Re: Barbara J., 215 Conn. 31, 45 (1990). In Re: Luis C., 210 Conn. 157,165 (1989). The United States Supreme Court in Santosky v. Kramer, 455 U.S. 745, 753, stated that "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody to their child to the State. Even when blood relationships are strained, parents retain a vital interest. The most difficult issue that this court must decide is whether the parents can meet the child's special needs and will she be safe with them at this time and in the future. While this court has found that Jennifer has been sexually abused while in the custody of these parents by acts of omission and commission, neither parent has been found to have sexually molested her under any criminal law. There was no evidence of molestation from any physical examination but only her accusations against the father. In February and March 14, 1992, Dr. Barbara Mason, M.D., child psychiatrist at Yale, reviewed all the statements and reports of the clinicians in a comprehensive twenty five page evaluation of the parents the child's accusations and the foster parents Dr. Mason stated in pertinent part that "there is no definite proof that the parents had molested her. . . . However, given Jennifer's preoccupation with sexual themes and actions . . . it is most likely that she has viewed highly stimulating experiences and has been probably been involved directly in them."
Dr. Mason recommended termination primarily because she concluded that neither parent has the ability to comprehend or respond to Jennifer's special needs that she requires now and it would be detrimental to her to allow these parents more time to rehabilitate. (State's Exhibit S)
Dr. Henry A. Allen, M.D., a psychiatrist at Riverview Hospital testified that Jennifer told him in September, 1990, that she did not want to return to her parents which is highly unusual. He CT Page 3566 diagnosed her then as a special needs child, hyperactive, with a deficit attention disorder. The team at Riverview recommended placement in a specialized therapeutic foster home.
Bette Randlett, a psychiatric social worker at High Meadows, was Jennifer's therapist from March to September, 1991, or about six months. She didn't feel that the parents could be left alone with Jennifer during visits. She testified that this child would never feel safe with them and that there was no strong child-parent attachment. She believed that Jennifer was bonded to the present foster parents, because she called them "Mom and Dad".
Ms. Bernadeen Gagnon, a group therapist at High Meadows, testified that Jennifer should be adopted as soon as possible because she needs a permanent home now.
Dr. Paul Sadowitz, M.D., a child psychiatrist and consultant at High Meadows, testified that he would not return the child to these parents unless they would first admit to having sexually abused her as the first step to rehabilitation. In any event, they had failed to protect her from being sexually abused. She is a special needs child who needs a structured home that they could not provide her.
All of these expert opinions are based on interviews with these parents and other witnesses and evaluations of the child between January, 1990 and May, 1992. What has transpired from May, 1992, to the present time with these parents and the child is relevant and carries great weight as to what is now done in Jennifer's best interest. While expert opinion is entitled to great weight in termination proceedings such opinions are not a precondition for the courts' own judgment as to what should be done in the best interest of the child. The court has the duty as the trier of the facts to weight all the evidence and determine the ultimate issue, In Re: Teshea P., 9 Conn. App. 409 (1987); In Re: Jason S., 9 Conn. 98, 109 (1986), In Re: Noel M., 23 Conn. App. 410.
Mr. Robert Reitman, a family therapist from Croton Falls, New York, has been seeing these parents each week beginning in May, 1992, to the time of trial, or approximately for the past seven months. In his opinion, they both have been open and honest with him, now understand that they were responsible for exposing their daughter to sexually abusive materials and are both well along to being rehabilitated. After the ordeal they have been through CT Page 3567 during these past three years, and now realizing what Jennifer has suffered, he believes without any doubt that they will never abuse her again and will protect her from any sexual abuse or molestation in the future. (see testimony of Mr. Reitman — pages 118, 119 of transcript). He has been with them in therapy more than any other therapist or evaluator, and while they may not be intellectually sophisticated, he believes that neither of them had sexually molested Jennifer. Neither parent has any criminal record.
They were married several months after Jennifer was born, and as teenagers, had to live with their parents, and they had a great deal of stress during those first four years. Because the father lost his job in a rural upstate New York town where they both grew up, and graduated from high school. They were forced to relocate to Greenwich to find employment. To make matters more stressful, during this period, Jennifer had been a hyperactive and emotionally difficult child to handle. In Greenwich, he found a job as a truck driver for a local garbage firm, and she worked a part-time night shift at MacDonald's in order to make financial ends meet. Their marriage began to deteriorate and they both started to abuse alcohol. Mr. Reitman believes their marriage has grown much stronger and more stable and they have grown closer to each other during the past three years. They now understand what Jennifer has gone through and have great empathy for her and will do whatever is necessary to be reunited with her. After he read Dr. Mason's recommendation that their parental rights be terminated, and her reasons for it, as well as other reports he read by DCYS experts, he was amazed and disagrees with their reasons and recommendations to terminate their parental rights. He believes they both now understand her special emotional needs and will be able to handle them. In his opinion, they are both well on the way of being rehabilitated, and in that they should be reunited immediately rather than having their rights terminated. In his opinion, they both are doing an excellent job in parenting their three year old son, Steven, Jr. They want Jennifer to come home and become part of their family. He expressed his opinion on page 31 in his testimony of the transcript. "Well, I mean we have here a stable family, people who are effective parents with their other child, who live in a nice home, who love each other, who are happily married. The father continues to work to support the family. The mother is a loving mother. They are receptive to help. They don't have character disorder diagnosis. They don't have any behaviors which would alarm one. They basically need help in education to understand how to cope with a troubled child. And any parents who have troubled children need the same help." CT Page 3568
Dr. Charles F. Yackulic, M.D., a child psychiatrist at Four Winds Hospital on Katonah, New York, testified that he evaluated these parents at the request of their therapist, Robert Reitman, in September, 1992. They both acknowledged to him errors in parenting that have likely contributed to Jennifer's emotional illness because of inadequate attention to appropriate parent-child boundaries concerning adult sexuality. He believes that during the past six months they have made a serious commitment to engage in family therapy with Mr. Reitman and also have recovered from abusing alcohol through Alcoholic Anonymous. In his opinion to terminate their parental rights in this nine year old child would only contribute further to the chaos in her life. In his report dated October 10, 1992, he stated as follows: "Termination would most likely intensify Jennifer's fears of abandonment, as well as increase the likelihood that Jennifer will become disassociated from her emotions as the only way of handling the stress. It is essential that the helping agencies find a way to work with Jennifer's family as a whole, rather than continue to fragment the family." (Respondents Exhibit 1) He had not been able to interview the child and based his opinion on Dr. Mason's evaluation and other reports about the child that he reviewed. He estimated that the reunification of the child with these parents could be accomplished in about a year. He concluded as follows:
"In summary, I believe that Steve and Kathy have become seriously involved in a life long process of rehabilitation. They have reached a Point in their treatment in which both of them can tolerate feelings of remorse for the errors of omission in their past parenting of Jennifer. They will continue to desire only what is best for their daughter; for that reason they should be more effectively engaged in her treatment. To exclude Jennifer's parents further will only prolong and worsen her impulsive behavior."
The court found the testimony of Mr. Robert Reitman and Dr. Charles F. Yackulic, credible, probative, and persuasive that they will be able to meet Jennifer's special needs, as well as the love and support that she so desperately needs. Their testimony was as persuasive on cross-examination as it was on direct.
Both parents also testified of the events that preceded Jennifer's commitment to DCYS and the three years that followed, the confusion and ordeal that they experienced. They felt that they have done all that DCYS had required of them and by "going CT Page 3569 along" that Jennifer would be returned to them after treatment for her emotional problems. The experts and DCYS concluded that by not admitting to having sexually abused her, and the father denying having molested her, they could not be rehabilitated. The reports DCYS received described the mother as a "limited woman with poor communication skills and poor ability to verbalize feelings" Mr. Barrows was described as capable of shallow emotional attachments and having deep seated resentment and was very guarded in interacting with a therapist. (State's Exhibits T and S). For all intent and purposes, DCYS had given up on rehabilitating these parents through therapy in November of 1990, when they were discharged by Family Children Services because they refused to admit having sexually abused Jennifer. It was a condition precedent to rehabilitation for DCYS. DCYS should have made other family and individual counseling available to them.
From observing these parents on the witness stand, and during this entire trial, the court believes they are intellectually unsophisticated, but credible. More importantly determined to be reunited with Jennifer. During the past three years, both have substantially complied with what DCYS required of them. They visited with her as many times as DCYS allowed. They attended DCYS treatment plan reviews, appeared for all court dates, and attended each day of trial. They were responsive and credible witnesses. The mother's testimony has convinced the court that her love and affection for her daughter is unwavering. The father appeared to have the same desire for reunification but did appear distrustful of DCYS and other authorities. After being in therapy with Mr. Reitman, he has now accepted the responsibility that he contributed to Jennifer's emotional illness, realizes her special needs, and is willing to continue to work to meet them. The court finds that both parents are ready and willing to provide structure, love and support that Jennifer desperately needs, and that both of them have made substantial progress during these past seven months to be reunited with her.
In recommending termination, Dr. Mason and other DCYS experts believe that Jennifer is adoptable, and being nine years old, needs a permanent home as soon as possible. Dr. Mason also stated that continued uncertainty about her future will likely cause irreparable damage of her ability to trust people. (State's Exhibit S.)
During the past three years, Jennifer has been in six different placements, and additional placements is likely to cause CT Page 3570 to regress according to the DCYS testimony and recommend find adoptive parents as soon as possible. However, the DCYS caseworker and other witnesses testified that her current foster parents, are not able to adopt her, and it could take two years to find appropriate adoptive parents. This delay, with the risk of having this nine years old child remained locked in foster care, is the worst possible fate for her. To plan for reunification with her parents would give Jennifer the permanency that all the experts agree she needs. DCYS presented a great deal of testimony that the child was afraid of being left alone with her parents and didn't trust being with them without supervision by DCYS worker or with a therapist at High Meadows.
Towards the end of the trial, the court asked counsel if Jennifer was to be called a witness. All counsel felt that she would be emotionally traumatized by coming to our court. DCYS, based on expert opinion, were opposed to calling her. The court then announced that it would interview her at High Meadows and invited counsel to be present. Counsel waived being present, but they all agreed to submit questions prior to the interview that would be reviewed by Ms. Jeanne A. Deckert, her present therapist at High Meadows. Sec. 46b 138 C.G.S.; Sec. 1042(7) C.P.B. and In Re: Noel, 23 Conn. 410, 426.
The court met with Ms. Deckert on two occasions to review the questions. Ms. Deckert told the court that Jennifer might only answer two or three questions because she has a short attention span, tends to be hyperactive with strangers, and is unpredictable. On February 23, 1993, the court interviewed Jennifer for about thirty minutes in the presence of Ms. Deckert. She understood that I was a judge and that the trial was in progress and that I was to decide her future.
This nine year old child was friendly, appeared to be happy and was eager to answer my questions. She also showed signs of being hyperactive. She understood why I was there and some of her answers to my questions were as follows:
Q. Can you tell me where you are living now?
A. With the family.
Q. What do you call them?
A. Mom and Dad. CT Page 3571
Q. Do you feel safe living with them? A. Yes
Q. Do you like school here at High Meadows? A. Yes
Q. What do you call your parents? A. Mom and Dad
Q. Do you enjoy when they visit you? A. Yes
Q. Do you feel safe being alone with them or do you want Jeanne in the room with you. A. I feel safe and do not need her in the room with me when they visit.
Q. Would you feel worried about being alone with your Mom and Dad?
A. No, I would like to go home to live with them in Brewster, New York, and go to school there. I should live with them in my real home.
Q. Did your Dad ever hurt you? A. No.
Q. How do you feel about him? A. I love him.
Q. Didn't you tell a bus driver and other people that your father hurt you? A. No, I told them about my feelings.
Q. Did you call your mother a few weeks ago on her birthday?
A. Yes. I called her to tell her that I love and miss her and want to come home.
Q. Do you think it would be safe for you at home in Brewster, New York?
A. Yes, I would like to go home tomorrow.
I reminded her that the school year at High Meadows would not end until the last week in June and that I would have to consider what Ms. Deckert and others at High Meadows felt about what would be best for her. She said it would be good for her to go home in June or on her birthday. She walked over to the calendar and pointed to October 6th, and said she would be ten years old then. When I asked her what she would do if she had problems with her Dad she said she would tell her mother, and the "brat", referring to her brother, Steven, Jr. CT Page 3572
On February 24, 1993, the next trial date, the court in the presence of the parties and all counsel, reviewed Jennifer's answers on the record. The court recognizes that most experts agree that even a sexually abused child would express a desire to be returned to her natural parents, I found her answers to be credible and persuasive. While her answers alone would not justify being reunited with her parents, the child's desire is relevant to the disposition.
On the final day of trial, the DCYS caseworker, Ms. Daymond, on redirect, again stated that the parents have not yet be able to acknowledge the severity of Jennifer's emotional problems and have not been rehabilitated. She also confirmed that the foster parents, were not able to adopt her and that the permanent DCYS plan was to retain a service to find adoptive parents for her.
The court has previously found that the respondent parents have made substantial progress during the past seven months in acknowledging Jennifer's special needs and have made substantial progress to rehabilitate with Mr. Reitman and will not repeat these findings as well as his opinion that she would be safe with them.
Based on all of the evidence presented, and in particular the testimony of Mr. Reitman, Dr. Charles F. Yackulic, M.D. the respondent parents, and the child, the court finds that it would not be in Jennifer's best interests to terminate the parental rights of the respondent parents, therefore, the petition is hereby dismissed.
On February 10, 1993, the court granted a petition to extend the commitment to DCYS for an additional eighteen months to November 29, 1993, subject to the right of any party being able to file a petition to revoke this commitment at any time, and subject to this decision. The court issues the following orders:
1. During the remainder of the school year, DCYS shall allow weekly unsupervised visits at High Meadows. DCYS shall also arrange for the parents and Jennifer to be given family therapy either before or after visitations at High Meadows. On or before June 15, 1993, the parents and the child shall be evaluated by Dr. Mark Simms, M. D., at the Danbury Hospital Pediatric Clinic to consider if overnight visits at the parent's home in Brewster, New York and/or having the child spend the summer vacation with them is in her best interests. CT Page 3573
2. DCYS shall forthwith order a home study by the Westchester County child caring agency for the Brewster, New York area, or the state of New York to investigate and recommend a school in that area similar to High Meadows that could meet Jennifer's educational needs for the next school year.
3. The parents shall continue individual and family therapy with their current therapist, Mr. Robert Reitman.
4. If and when overnight visits, or Jennifer's summer vacation would be permitted at the parents' home, DCYS shall arrange with the proper child caring agency of Westchester County or the State of New York to make announced or unannounced visits at the Brewster home.
5. Any petition to revoke the commitment shall be accompanied by a report from an independent licensed psychologist or psychiatrist that there is no longer a cause for it to remain in effect.
6. DCYS shall file a progress report on the effect of these orders with an in-court review on or about June 18, 1993.
PETRONI, J.