[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In the instant case, the court must decide whether the petitioning Commissioner of the Department of Children and Families (hereinafter D.C.F.) has proven allegations that Jessica S. is neglected and uncared-for and, if so proven, dispose of the case in the best interest of the child. The respondent is Nancy S., Jessica's mother.[1] Paul S., the child's father is deceased.
The litigation had its inception in the Probate Court for the District of Plymouth when Fred S., Jessica's paternal grandfather, filed a petition to terminate Nancy's parental rights. Temporary custody of Jessica was given to the grandfather, by the Probate Court on June 6, 1993. Pursuant to CT Page 8393 General Statutes § 45a-715(g), the termination case was transferred from the Probate Court to this court on August 12, 1993 at the request of the child's attorney. In this court, D.C.F. was allowed to intervene in the termination action as an interested party.
On August 19, 1993, D.C.F. filed and had served the present petition in which a neglected and/or uncared-for status for Jessica is claimed. D.C.F.'s action prompted the following rulings from the court: A dismissal of the then pending termination of parental rights petition and a new order of temporary custody vesting custody of Jessica in her paternal grandparents Fred and Jean S. The court also granted the grandparents' motion to intervene but limited their participation as parties to the dispositive phase of the litigation.
 I.
The rules governing petitions alleging that a child is neglected or uncared-for require consideration in two phases adjudicatory and dispositive. Practice Book §§ 1042.1, 1043.1. In the adjudicatory phase the court decides whether the allegations have been proven and is limited to events preceding the filing of the petition or the latest amendment thereto. Id. § 1042.1(4). For the depositive phase, events occurring through the close of the trial may be considered. Id. § 1043.1(1). Whether each phase should be the subject of a separate hearing or whether a nonbifurcated hearing should be held covering both phases is a discretionary matter with the court. Id. § 1042.1(4); In re Juvenile Appeal (84 AB), 192 Conn. 254,259 (1984). A disposition, however, may not be considered until the adjudicatory phase has been concluded. Practice Book § 1042.1(4).
In this case, the presence of the paternal grandparents as parties in the dispositive phase necessitated a separate hearing but the testimony of several witnesses during the adjudicatory hearing overlapped both phases.
The petition contains the following allegations: "(1) [Jessica] is being neglected in that she is being denied proper care and attention, physically, educationally, emotionally and morally; (2) [Jessica] is being permitted to live under conditions, circumstances or associations injurious to her well being; (3) [Jessica's] home cannot provide the specialized care CT Page 8394 which her physical, emotional or mental condition requires." Accompanying, the petition is a list of several factual episodes upon which D.C.F. relies to prove its claims. In a proceeding to determine whether a child is neglected or uncared for, the standard of proof is a fair preponderance of the evidence. Practice Book § 1050.1(2); In re Juvenile Appeal (84-AB),supra at 264.
 II.
From the evidence including reasonably drawn inferences, the court finds that the following facts were established on the adjudicatory phase of the trial.
Jessica was born on September 10, 1989. On March 6, 1993 when Jessica was three years old, she and her mother Nancy were at the J M Restaurant in Wolcott, Nancy threw wine from a glass onto Jessica's face. The child then went or was taken to the ladies' room. When she returned, Nancy threw water at her and slapped her across the face.
A hostess at the restaurant observed what had happened and called the Wolcott Police. When a Wolcott officer arrived, Nancy told him that he would have to drag her from the restaurant and rambled in her conversation. In the officer's presence, Nancy twisted Jessica's arm and said that she was disciplining her daughter. In spite of what occurred, Jessica appeared to be all right. The officer noted Jessica's apparent good condition in his report to D.C.F. No arrest was made and one week later D.C.F. notified the officer that no further action was necessary.
On June 6, 1993 at about 3:21 a.m., the Rhode Island Department of Children, Youth and Families (D.C.Y.F.) received a referral from Rhode Island Hospital in Providence. Nancy and Jessica had been hitchhiking on Interstate Route 95 where they were picked up by a passing motorist and brought to the Providence Police Department. From the station they were brought by the police to the hospital. Jessica had no jacket and was not wearing shoes. Nancy told a social worker from D.C.Y.F. that her car had broken down.[2] The social worker tried to obtain the name of someone to call. Nancy suggested the Governor of Rhode Island, the Rhode Island State Police and her husband who she said was deceased but still accepted telephone calls. At the Rhode Island Hospital, Nancy called "information" and got the telephone numbers for the Rhode Island Governor, the Rhode Island CT Page 8395 State Police, the Providence Bulletin and a number that she said was for the North Pole.
The Rhode Island agency considered Jessica to be at risk because of Nancy's mental instability. Fred and Jean S., the paternal grandparents, were called and arrived in Providence the next day. Jessica was happy to see them. Before being released to her grandparents, Jessica was examined by a doctor at Rhode Island Hospital and found to be in good health. From telephone calls that were made, D.C.Y.F. learned that Nancy had previous confinements in mental hospitals in Connecticut. She was admitted to Rhode Island Hospital but thereafter was released.
It was the episode in Rhode Island that caused the paternal grandparents to initiate the probate action whereby they gained temporary custody of Jessica. Prior to the Rhode Island incident, however, D.C.F. was aware of complaint of assaultive behavior by Nancy's then-living husband Paul toward her in the presence of the child. Paul died on April 27, 1974 [1994]. But Nancy's comments made him almost alive to Jessica. For example, one time, at the beach, the paternal grandparents told Jessica that her father was in heaven. She asked if traveling to visit him in a balloon were possible. Nancy's comment that they would drive to heaven in the car confused the child. Dr. Sadler, the Psychiatrist in the case, described Jessica's lack of clarity as to who was alive and who was dead as bizarre and somewhat ominous.[3]
Even before the Probate Court vested the temporary custody of Jessica in the paternal grandparents, their relationship with Nancy can hardly be described as good. In 1991, the paternal grandmother asked the Plymouth Police to come to her home because Nancy was there acting in a strange manner and not feeding Jessica. When the police arrived and questioned Nancy, her answers were incoherent. After the Probate Court's action, the relationship worsened. Nancy harassed the paternal grandparents on the telephone.
As part of their custodial duties under the Probate Court's order, the paternal grandparents supervised Nancy's visits with Jessica. The visits were stressful. On June 11, 1993, the paternal grandfather, at Nancy's request, agreed to drive from Terryville[4] to Bristol for the taking of photographs of Jessica. Nancy and Jessica became involved in a dispute at the studio when Nancy wanted Jessica to put on a different dress. CT Page 8396 Jessica ran under a table and Nancy slapped her twice across the face. The grandparents became upset and left the studio taking Jessica with them. Another incident was the Nursery school graduation. After the ceremony Nancy refused to return Jessica to the paternal grandparents who had decided not to stay for the subsequent reception. Jessica became distressed. The paternal grandfather called the police. At the urging of school personnel, Nancy surrendered Jessica to the grandparents. On some visits, Nancy brought one of Jessica's favorite toys but she would not let Jessica take the toy to the grandparents' home. Nancy's actions with the toys upset Jessica.
Nancy and the grandparents used the beach at Fall Mountain Lake in Terryville. The paternal grandfather terminated a visit when Nancy took Jessica on a rubber raft to where the water was deeper than Jessica's height. Another time at the beach Jessica defecated on apiece of paper. Nancy brought the paper with the excrement near to the grandparents' car and said to the grandmother "[h]ere is your lunch."
Nancy's refusals to give Jessica to the paternal grandparents when visits were ended was upsetting to the child. On the grandparents' part, Nancy's attitude resulted in the grandfather carrying the probate decree with him so that, if needed, he could show it to the police. The grandparents also forbade Nancy from coming to their home.
Several diagnoses were made of Nancy's mental condition.[5]
The report of the Rhode Island D.C.Y.F. contains a notation from an interviewing clinician that Nancy is a paranoid schizophrenic. Dr. Mantell, a Psychologist, who evaluated Nancy on September 21, 1993, described her as having an actuarial pattern matching those of persons with a bipolar affective disorder and those who have schizophrenia of a paranoid type. Dr. Sadler, the Psychiatrist who examined Nancy on October 12 and 15, 1993 wrote in his report that when interviewed, Nancy was functioning in a paranoid manner. At the trial, however, Dr. Sadler described Nancy unequivocally as a paranoid schizophrenic.
Dr. Goldberg, a Psychiatrist, has seen Nancy briefly once per month since December 15, 1993 after she as [was] discharged from Cedarcrest Hospital where the diagnosis was schizo affect disorder. His association with her comes from his position at Bristol Hospital where he is the medical backup for people who are being treated by non-medical psychotherapists. After her CT Page 8397 discharge from Cedarcrest, Nancy has been under the care of Thomas Romans a certified independent social worker.
Dr. Goldberg disagreed with the assessments by others that Nancy was afflicted with paranoid schizophrenia or a schizo affect disorder. His diagnosis was reactive psychosis with a secondary diagnosis of personality disorder. He described the personality disorder as "histrionic" meaning an overreaction to ordinary events. This diagnosis was predicated on the following factors: Dr. Goldberg had never seen Nancy in a psychotic state; schizophrenia or schizo affect disorder is supposed to manifest itself to others when the person affected is 18-25 years old and in that time of Nancy's life she was able to attend college and to pursue a graduate degree; Nancy's response to prescribed medicines was prompt and she showed an ability to control her behavior even when the medicines were not taken.
D.C.F. had received several referrals concerning Nancy and Jessica. The first one came when Paul was alive. A "full protective order" keeping him from the marital home was issued by the Bristol Superior Court on Nancy's complaint of assaultive behavior. A second referral came from the Wolcott police based on the occurrence on March 6, 1993 in the J M Restaurant as described earlier. Third was a report of an incident involving Nancy and Jessica at Vy-John's Restaurant in Thomaston on April 16, 1993. As a result of this incident, D.C.F. referred Nancy to Wheeler Clinic. Fourth was the incident reported by the Rhode Island D.C.Y.S. Fifth was a report from an anonymous call on June 7, 1993, saying that Nancy had slapped Jessica twice on the face leaving marks. And sixth was information received on August 16, 1994 from a funeral home to the affect that Nancy had inquired about a casket for Jessica.
 III.
A determination of whether the facts of this case place Jessica in a category of a neglected or uncared-for child should be preceded by the statutory definitions of these terms. A child may be found "uncared-for" when the home cannot provide the specialized care which the child's physical, emotional or mental condition requires. General Statute § 46b-120. A child may be found "neglected" when the child is being denied proper care and attention, physically, educationally, emotionally or morally or is being permitted to live under conditions, circumstances or associations injurious to the child's well-being. Id. The CT Page 8398 statute contains some other definitions of "neglected" and "uncared-for" but only the foregoing ones have been included in the petition.
Apparent from the findings of fact is that Jessica was not proven to be an uncared-for child. There was no showing that she had any need for specialized care.
The definition of a "neglected child" is more inclusive. Two parallel routes exist, the denial of proper care and the being permitted to live in a deleterious atmosphere. Because the definition is written disjunctively proof of either method of committing neglect will suffice. See Horak v. Middlesex MutualAssurance Co., 181 Conn. 614, 617 (1980) (use of the disjunctive "or" between two parts of a statute indicates a clear legislative intent of separability).
In the court's view, Nancy's conduct, perhaps caused or exacerbated by her mental condition, satisfied both routes of neglect. Allowing a three year old child to walk barefooted on a highway in the late evening/early morning; slapping the child's face and throwing wine and water in her face in public or semi-public places; taking the child on a rubber raft into water of a depth greater than her height; not allowing the child to take some favorite toys to the grandparents' home where she is living; and confusing the child with fantasies as to an ability to reach her deceased father are by their very nature denials of proper physical and emotional care as well as conditions and circumstances injurious to the child's wellbeing. The court rejects Nancy's suggestion that a child cannot be neglected unless an injury is evident. Otherwise there would be no need for separate statutory definitions of neglect and abuse. Compare
the language of General Statutes § 17a-101(b)(d) and (e) with that of § 46b-120. Accordingly, the court concludes that Jessica's status as a neglected child was established not only by a fair preponderance of the evidence but also by evidence that was clear and convincing.[6]
 IV.
On an adjudication that a child is neglected, General Statutes § 46b-129 (d) provides several alternatives. The child may be committed to D.C.F. for a maximum period of eighteen months or returned to the family with or without an order of protective supervision. In re Juvenile Appeal (84-AB), 192 Conn. 254, CT Page 8399 261 (1984). Or a third-party guardianship may be imposed.In re Juvenile Appeal (85-BC), 195 Conn. 344, 365-66 (1985). A disposition must take into account the totality of the circumstances and be in the best interest of the child. In reNoel M., 23 Conn. App. 410, 425 (1990).
Two plans have been submitted. The plan of D.C.F. endorsed by the paternal grandparents is that Jessica should be committed for eighteen months and continue to live with the paternal grandparents. The particulars of the D.C.F. plan are as follows: Recommendations for visitation: 1-1/2 hours once per week with an additional 3 hour visit once per month, all visits to be supervised; the above visitation schedule to continue for 6 months when it would be reviewed and evaluated based on Nancy's progress in stabilizing mental health issues and concerns; the review should address and emphasize the issues of supervision, frequency and locality of visitation; the possibility that the supervisor of the visits will be a family member is considered. Recommendations for rehabilitation and reunification: Nancy must remain crisis free for 6 months; Nancy is to engage in parenting classes to address the issues, age appropriate discipline and age appropriate parent-child reaction; Nancy to participate in classes dealing with budgeting and managing money to enable her to achieve financial stability. Reunification planning: to begin when recommended by Nancy's therapist and re-evaluation by Dr. Mantell as to Nancy's ability to provide for Jessica's physical and emotional needs. D.C.F.'s plan ends with the warning that "[i]f reunification planning cannot take place within 6 months, [D.C.F.] will begin permanency planning for the child.
Nancy's plan, if an adjudication occurred, is that Jessica should be returned to her care under an order of protective supervision pursuant to which she would supply D.C.F. with releases so that her continuing compliance with therapy and medication as well as Jessica's school records could be monitored and reviewed. Nancy's plan also offers liberal visitation to the paternal grandparents.
In Jessica's best interest and with due consideration for the totality of the circumstances, the court, based on evidence that was clear and convincing,[7] accepts the plan of D.C.F. with certain changes. Weekly visitations should be increased from1-1/2 to 3 hours plus the additional 3 hour visitation once per month. An appropriate supervisor should be found promptly. The six month time period required for reunification planning is too CT Page 8400 short in light of the psychiatric and psychological testimony and there is no need for extensive permanency planning in that, on a permanent basis, Jessica will be residing with Nancy or the paternal grandparents and has good relationships with both. Appropriate releases when requested must of course be given by Nancy so that her progress in therapy and financial counseling as well as her medical, psychiatric and psychological evaluations can be monitored and reviewed.
One of Nancy's contentions is that the type of her mental illness must be pinpointed. The court disagrees since the plan submitted by D.C.F. is for the reunification of mother and child. Much will depend on Nancy's taking the medicines prescribed by Dr. Goldberg. If she is afflicted with schizophrenia, it is a treatable disease. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed.). Dr. Sadler testified that a paranoid schizophrenic can parent a child.
Moreover, on November 8, 1993, after being apprised of Nancy's mental condition by her attorney, the court was required to have Nancy examined by Dr. Sadler.[8] The result of the examination was that the police were called to bring Nancy to Charlotte Hungerford Hospital. See General Statutes §17a-503(a). From that institution, Nancy was transferred to Cedarcrest Hospital. The court respected Nancy's claim that the Cedarcrest records were privileged. Apparently, the Cedarcrest records were made available for Dr. Goldberg since he included the Cedarcrest diagnosis in his testimony. The court notes that the Cedarcrest diagnosis was more like the diagnoses of Dr. Sadler and Dr. Mantell then the diagnosis of Dr. Goldberg.
 V.
The child Jessica S. is committed to the Department of Children and Families for eighteen months. D.C.F.'s treatment plan as modified by this memorandum shall be the operative plan. An in-court review will be held in six months.
BARNETT, J.