MEMORANDUM OF DECISION
On September 10, 1996, the Department of Children and CT Page 12234 Families filed a neglect petition alleging that the minor child, Jasmine P., was "uncared for" because she had no home and was neglected because she was being permitted to live under conditions, circumstances or associations injurious to her well-being, as set forth in Connecticut General Statutes §46b-120. At the time of the petition. Jasmine was seventeen months old. Her mother, Lashonda M., was incarcerated and had left her daughter with certain friends whose families had open cases with the Department. This is the second petition filed on behalf of Jasmine. An earlier petition had been filed in June of 1995, when Jasmine was just two months old. That petition was subsequently withdrawn in February of 1996, as Lashonda was then living in New York with her daughter.
Jasmine's biological father, Jon. P., filed a plea of nolo contendere with the court on the first day of trial. His plea was found to be voluntarily and knowingly made with the advice and assistance of competent legal counsel and with a full understanding of its consequences. His plea was accepted by the court. Further, the mother has also appeared and has a court appointed attorney as well as a guardian ad litem. The mother, Lashonda M., attended the hearing with counsel, who ably cross examined the witnesses and contested the petitioner's case. The court finds that it has jurisdiction in this matter and that there is no pending action affecting the custody of Jasmine in any other court.
The court having read the petition, the social study and its update, the case status reports, and the other documents entered into evidence and heard the testimony of Dr. Mantell and the case worker, makes the following factual findings:
The mother of this young child, Lashonda M., has had some significant difficulties in her own life. She is now twenty-one years old. She required special schooling from an early age. alternative educational placements and years of therapeutic intervention, due to her mental health impairments. She herself describes her first years as being full of verbal, mental and physical abuse at the hands of her mother. Before she graduated from high-school, at age 16, she gave birth to her oldest child, a son, Laquan, who is in the care of his paternal grandmother. Lashonda has had many legal disputes concerning this child.
Some time later, she began a relationship with Jasmine's father, Jon P., who is now nineteen. They continue to have an CT Page 12235 intermittent relationship today, with Jon living in the same apartment with Lashonda as of the week before trial. Their relationship has been very stormy and characterized by physical assaults and drug use. Some months after Jasmine's birth on April 14, 1995, Lashonda took an overdose of pills and was psychiatrically hospitalized on June 26, 1995 for several days. The day before this suicide attempt, Lashonda and Jon had ended their relationship. Lashonda also admitted she tried to stab Jon P. when he and her sister "disrespected her". There has been domestic violence in the household, most clearly by Lashonda against Jon.
On June 30, 1995, the Department filed a neglect petition after obtaining an order of temporary custody. A service agreement was signed by Lashonda, requiring her to take her medication, enter counseling, participate in psychiatric services and take parenting courses. In October, Jasmine was returned to her mother's custody and expectations were signed by Lashonda, setting forth many of the same concerns.
As of December 14, 1995, after an evaluation by Dr. Mantell, he found that:
 ". . . mother is a psychologically distressed person with a problematic history which includes a variety of psychological, adjustment, relationship and legal difficulties. Presently, she is significantly distressed emotionally. . . . . .
 It is evident that Lashonda has tremendous difficulty in caring for herself as well as both of her children. I see a chronic pattern of emotional and social difficulty which has had a handicapping impact on mother as well as on her relationships with her children. Her judgmental impairments are probably related to her psychological disturbance. She should be seen for both psychiatric as well as psychological care. These should be considered pre-requisites for her continued custodial/parenting involvement with the child. . . . It is clear that she requires continuing professional care."
At trial, Dr. Mantell noted that he had not seen the mother with her daughter since that date. Nonetheless, he stated that Lashonda had serious and significant problems which were not likely to abate. He stated that she "needs a supportive environment". CT Page 12236
In November of 1995, Lashonda went to live with her aunt, Dawn M., in New York. Dawn was a stable and helping influence in the life of Lashonda and her daughter, Jasmine. While in New York, Lashonda was employed part time and appeared to be making strides toward personal stability. In the spring of 1996, Lashonda returned to Connecticut, after her relationship with her aunt broke down and she failed to conform to the requirements of responsible behavior her aunt had set for her.
On August 28, 1996, as a result of a search warrant obtained by the Statewide Narcotics Task Force. Lashonda and her boyfriend were found in possession of a small amount of marijuana and drug paraphernalia, which was accessible to Jasmine. At that time, the apartment contained minimal furnishings and very little food. The next day, while in court, Lashonda got into an argument with the judge and was sentenced to thirty days in jail. When questioned about this event while testifying at trial, Lashonda admitted that she had not apologized to Judge Sheinblum for her conduct, although she stated that she had explained that she had a small child at home.
Lashonda left Jasmine in the care of two friends, Lillian C. and Natalie McQ., both of whom had open cases with the Department regarding their own children. When questioned, Lashonda M. could not adequately answer why some other provision for Jasmine had not been made the day she was summarily incarcerated. She did speak of the difficulty of making telephone calls while incarcerated. Ten days later, Lillian C. called the Department to come take Jasmine as she could not care for her. At that time, September 9, 1996, the Department invoked the ninety-six hour hold and filed the present petition on September 10, 1996. Lashonda received notice of these events while incarcerated.
Prior to and after the filing of the petition, Lashonda has received significant services from the Department to assist her in reunification efforts with Jasmine. The services included referrals to the Wheeler Dual Diagnosis program, the Klingberg Family Preservation service, the Lifeline program at Wheeler Clinic and VNA parent aide services. She did not readily accept such services or participate in counseling. At the time of the first petition in 1995, a service agreement was entered into and in October of 1995, interim court expectations were set which set forth her need to utilize the services referenced as well as her need to take medication. While there is some indication that CT Page 12237 Lashonda does not presently have a prescription for any psychotropic medication, it is evident that she had resisted treatment and services at all levels and not benefited from what little effort she has made.
Since the events of the fall of 1996, the Department has had contact with the aunt, Dawn M., who continues to be willing to be a resource for Lashonda and Jasmine. An interstate compact study was undertaken, which has not yet been completed. Preliminary findings indicate that Dawn M. would be a suitable placement resource. She is a caring and stable individual, with no substance abuse problems and has regular employment with the New York Police Department.
Since Jasmine was removed from her mother's care, her mother has had regular visitation with her once a month. Jasmine suffered a greenstick fracture on her right elbow after a fall from a kitchen chair at her first foster care placement. At her mother's request, she was removed from that foster home. Medical and other investigation found that the child's injury was an accident. Nonetheless, Lashonda carefully examines her daughter at each visit to make sure she is physically intact, taking time and attention away from more emotionally appropriate contact. Observers note, however, that her interactions with Jasmine are generally appropriate. She demonstrates love and concern for her daughter. She is usually available for visits, has forgotten a few times and requires assistance to attend upon occasion. On one visit in May of 1997, Lashonda was observed slapping her daughter. She had just had a fight with Jon, who also visited and had stormed out. He has not visited since that time and has only sporadically been involved with his daughter.
ADJUDICATION
Based upon the testimony and the documents entered into evidence, the court finds by a preponderance of the evidence that Jasmine P. as of September 10, 1996 was "uncared for" because she was homeless at that time. The court further finds that Jasmine was neglected as she was being permitted by her mother to live in circumstances and associations which were injurious to her well-being in the home of acquaintances while her mother was incarcerated.
DISPOSITION
CT Page 12238
At the conclusion of the trial, all parties submitted their plans for the disposition of this matter. Upon adjudication, Connecticut General Statutes § 46b-129 (d) authorizes the court to order various optional placements. Any such disposition must take into account the totality of the circumstances as well as the best interests of the child. In Re Noel M.,23 Conn. App. 425, 580 2.d 996, (1990). With the exception of the father's plan, all argued that Jasmine's best interests would be served by a commitment to the Department for varying lengths of time and with various conditions. The court has carefully considered the various plans submitted. Based upon the evidence, the court finds that it is in the best interests of this child that she be committed to the care and custody of the Commissioner of the Department of Children and Families for a period not to exceed one year. Also based on the history of the maternal aunt's involvement and her ability in the past to provide structure and stability to both Jasmine and her mother, the court directs that a transfer for guardianship be considered upon completion of the Interstate Compact study. The court further orders the following that:
 1. Both parents participate in an intensive program such as Lifeline at Wheeler Clinic to address their numerous issues, and for Lashonda specifically, her history of drug abuse psychological and psychiatric concerns, and parenting issues.
2. Both parents attend parenting classes.
 3. Both parents find and maintain suitable and stable housing and income with the Department to provide such assistance as resources permit;
 4. Both parents remain free from the use of illegal controlled substances and from further involvement with the criminal justice system.
 5. An in-court review hearing is to be scheduled in March, 1998, with the date to be set for a time convenient for the referring Juvenile Court's docket. At the hearing, the court should determine the parents' level of compliance with the expectations ordered. If Lashonda is meeting the expectations set, the court should consider the desirability of further reunification efforts and if not, the transfer of guardianship to the maternal aunt, Dawn M.
CT Page 12239
Barbara M. Quinn, Judge Child Protection Session